## ALLIANCE SECURITIES CO. v. DE VILBISS MFG. CO.

### No. 5212.

Circuit Court of Appeals, Sixth Circuit.

June 13, 1930.

Samuel E. Darby, of New York City (Darby & Darby, of New York City, and Byron Coleman, of San Francisco, Cal., on the brief), for appellant.

Wilber Owen, of Toledo, Ohio (Owen & Owen and Charles W. Owen, all of Toledo, Ohio, on the brief), for appellee.

Before DENISON, MOORMAN, and HICKENLOOPER, Circuit Judges.

DENISON, Circuit Judge.

Infringement suit upon patent No. 1,196,691, issued August 29, 1916, to Hopkins, for a paint-spraying apparatus. In 1924, Hopkins began suit on this patent in California against one Mohr, who was using what is known in this record as the first form of apparatus manufactured by the De Vilbiss Company, of Toledo, the defendant and appellee herein. It assumed the defense of the Mohr Case, with the knowledge of plaintiff. There was a decree in plaintiff's favor, entered in 1925 and affirmed by the Ninth Circuit Court of Appeals in 1926. 14 F.(2d) 793, affirmed 14 F.(2d) 799. The plaintiff in that case and this, the owner of the Hopkins patent, then brought this suit against the De Vilbiss Company at Toledo. After the Mohr suit it had been making the forms

known as its second and third. The court below held that these two forms did not infringe the patent, and that plaintiff's right to accounting and for damages for the manufacture of the first form had been lost by laches and because plaintiff had used unfair means in the assertion against the trade of its rights based on that decree. The court below further held that defendant was entitled to an injunction against such unfair means and an accounting of its damages caused thereby.

The De Vilbiss Company does not deny that it was privy to the California suit, and that the decree therein is an adjudication concluding it as to the validity of the Hopkins patent and its infringement by the first form. It is, however, clear that the scope of the Hopkins patent, as extending its monopoly beyond the first form, and the specific questions of infringement by forms two and three were not involved or decided in that case, and are therefore now open.

■ Since the original decree in California, and in subsequent suits brought by plaintiff against Ford and the Roman Company, the Ninth Circuit Court of Appeals has decided that forms similar to 2 and 3 are not infringements. 31 F.(2d) 278, 279. The same result has been reached by the Eighth Circuit Court of Appeals in the Matthews Case, 40 F.(2d) 879, decided April 5, 1930. The point is so well discussed in the master's report, which was the basis of the Ford and Roman decisions, and in Judge Stone's opinion in the Eighth Circuit Court of Appeals, that we can add little, and will not take the space for a detailed discussion of the facts. We concur in the results reached by these two courts on this subject.[1]

The question turns on the meaning of the mutual independence of the two air valves called for in the claim. Upon the face of the specification and claims, infringement can plausibly be asserted, for within a certain range of operation (a range perhaps covering the ordinary practical field) the two valves in forms 2 and 3 are mutually independent; but the file wrapper strongly indicates that Hopkins had in mind a more complete independence; and—more important in our view—to give the broad construction necessary to make out infringement by forms 2 and 3 would seem to include prior art structures and thus invalidate the claims.

Hopkins interposed in each of his lines means for reducing or controlling the air

pressure. In his specifications he refers to this as a "reducer," or an "air reducer." He does not specify what form this reducer shall take, except as in his drawing numerals 6 and 9 indicate, merely conventionally, what he calls in one case a reducer and in the other case a reducing valve. With each of these he shows a gage "for the purpose of observing the pressure passing through." In the claims, this element is described as "controllable reducing means," "controlled reducing means," "a pressure regulator," or "means to vary the pressure." These terms are all very general, and plainly cover such regulating valve or relief or controlling valve as was in common use upon the main air line after it left the original or main compressor or pressure tank or on the tank itself. To construe Hopkins' claims as covering a device where a reducing valve, anywhere on the main line above the branching point, controlled all the air pressure, and when there was in addition only a controlling valve on the branch leading to the paint tank, would make the claims read upon the old art. It is therefore necessary to the validity of the patent that the "independent control" of the claims should be construed as referring to a completely independent control, so that neither one, no matter how varied, can affect the other.

■ We are not able to concur in the view that plaintiff's right to maintain this suit and to have the ordinary remedies have been lost by laches. Defendant was a large manufacturer, if not the leading one, of this general type of apparatus. In 1917 it changed from its old gravity feed form to a pressure feed form, which developed into the first form here involved. In the California field, this device was put out by Mohr; and Hopkins says that he did not, until 1920 or 1921, know of any substantial infringement by Mohr. In January, 1921, he gave notice to the defendant, through Mohr, that he claimed infringement. There were negotiations between the parties for the next few months; and it does not seem that defendant had any good reason for supposing the infringement claim was abandoned. A suit on the patent was commenced in August, 1923, but went by default. Then Mohr was sued in January, 1924. Hopkins shows that from 1920 to 1923 he was personally financially unable to go into litigation with a strong opponent, and that the corporation which owned the patent had financial troubles and internal dissensions; in practical effect, the control of the company and of the patent was in controversy. It has been frequently held that the unusual years during and immediately after the great war

---

[1] We find nothing indicating that defendant was furnishing additional apparatus to complete an infringement, as in the Matthews Case.

constitute a period in which all reasonable postponement and suspension of litigation was a public duty. Further, the defendant only pursued the course of business it had adopted before it knew of this patent, and, when suit was brought, made no change until compelled by the decree. Still further, if the defense of laches was ever good it could have been made in the Mohr Case where the facts were fresher in the minds of all; but it was not there successfully made. It is not seriously suggested that after commencing the Mohr Case, the plaintiff has not been diligent in prosecution; it was under no obligation to bring a separate suit against the De Vilbiss Company at Toledo, while that company was defending the case in California; nor was Hopkins under any duty, legal or equitable, to go across the country to sue an infringing manufacturer at its home, when he could prosecute the same infringement in his home district. After the final termination of that suit, there was no substantial delay before commencing this one. In these circumstances, we cannot find sufficient reason for penalizing plaintiff by practically depriving it of the rights adjudicated to it in the California case. We have examined all the cases cited in the opinion below and in the briefs, and it is enough to say that we find no well-considered case, sustaining the defense of laches as a bar to an accounting, in which the facts were not sharply and clearly more favorable than they are here; we find no precedent fairly sustaining this defense here. In what is cited as the leading case, Kittle v. Hall (C. C.) 29 F. 508, 511, 512 (Coxe, District Judge), the defense was overruled. In General Electric Co. v. Yost Co. (D. C.) 208 F. 719 (appeal dismissed by consent [C. C. A.] 213 F. 1021), plaintiff had for six years been suing defendant on other patents, without mention of this. In Simpson v. Newport (D. C.) 18 F.(2d) 318, the question was neither involved nor decided.

■■ We come now to the counterclaim: It is alleged that plaintiff had been guilty of unfair competition by intimidating defendant's customers and the trade generally through false claims of infringement and liability under the patent in suit and through misrepresentations as to decrees and judicial decisions which plaintiff had obtained in its favor. Plaintiff challenges the right of the court to make this inquiry, and says that this is not the kind of counterclaim which may be prosecuted under general Equity Rule 30 (28 USCA § 723), which rule, plaintiff says, will not reach a case where the defendant, for lack of territorial jurisdiction, could not maintain

an original suit on that subject matter against the plaintiff in the district where the suit is pending. We are not called upon to decide the disputed construction of this rule, as evidenced by Ohio Brass Co. v. Hartman Co. (D. C.) 243 F. 629 (Westenhaver, D. J.), and Krentler-Arnold Hinge Last Co. v. Leman (C. C. A. 1) 13 F.(2d) 796. For the purposes of this opinion, we assume that the defendant had a right to be heard in this case on its counterclaim; and we proceed to observe its merits.

We are aware of no ground upon which claims of infringement made by a patentee can be considered a legal wrong unless those claims are made in bad faith; that is, maliciously. This bad faith may be made to appear in a variety of ways, but until it does appear the patentee has the right to notify all those whom he believes to be infringing that he will hold them for such liability as he may be able to establish; indeed, it has been said that it is his duty to do so, and it is apparent that under some circumstances he may lose rights if he does not do so. The subject is well covered by the comment of (then) District Judge Hand in Asbestos Shingle, Slate & Sheathing Co. v. H. W. Johns-Manville Co. (C. C.) 189 F. 611, 613. After reciting the holdings that an injunction against such claims by a patentee would not issue unless he was acting in bad faith, it is said: "Indeed, it is clear that unless the [patentee] did so act, it would be unjust to prevent him from advising users of his rights, etc." Of course, this view is not inconsistent with the right of an equity court in which an infringement suit is pending to restrain the plaintiff from oppressive and inequitable harassing of the defendant's customers.

Occasional instances are to be found of late years where injunctions have issued against claims of infringement and where the necessity of this basis in bad faith has not been expressly regarded as essential, but we find no such case which cannot be explained consistently with this fundamental basis and which is either authoritative or sufficiently persuasive.

Applying this test to Hopkins' conduct, we find nothing to be condemned. In his belief that defendant's first form infringed, he was right. His good-faith belief that forms 2 and 3 infringed must be tested by the situation when the counterclaim was filed (March 28, 1927), because it rested on acts then precedent. The belief that the patent claims cover forms 2 and 3 was not unreasonable upon the face of the patent; later decisions to the contrary (since the counter-

claim was filed) have been based upon disputed constructions of the patent and of the prior art. The trial judge in the Mohr Case had indicated a broad view of the position of the invention in the art, consistent with a broad scope of claim; the Court of Appeals in that case had indicated the same favorable view of the invention; and the trial judge in the Ford Case had, after hearing, issued a preliminary injunction reaching forms 2 and 3. Still later (but after the critical date) the trial judge in the Matthews Case—apparently, the matter is not entirely clear—gave this broad scope to the patent. Not until the Ninth Circuit Court of Appeals, in the Ford Case, held to the contrary did Hopkins have any very persuasive reason to abandon his position; even then he had the right to do as he did and insist in another circuit upon the broader construction. There can be no reason to doubt his good faith, and that of his counsel who insisted in the Ninth circuit and in the Eighth and in this appeal, that his patent covered every device which had two regulating valves, one controlling the tank pressure and one controlling the entire pressure.

There is no reason to condemn him because he insisted vigorously upon what he thought to be his rights; but defendant especially complains of some newspaper publications. When Hopkins obtained his first decree in the Mohr Case, and again when that case was affirmed, and again when he secured a preliminary injunction in the Ford Case, the San Francisco newspapers used headlines. They saw in the decisions a complete monopoly of commercial paint sprayers and they prophesied millions in royalties; and because Hopkins was a "poor inventor" and the Ford Motor Company stood for great wealth, this became a "human interest story," which was published in Detroit and elsewhere in the country. Doubtless this did some harm to defendant's business; but the testimony discloses no blameworthy conduct by Hopkins or his attorney; it is not shown that they told a reporter anything untrue or beyond a patentee's permissible optimism; nor is it disputed that if the patent had the broad scope which the preliminary injunction against the Ford Company indicated, it would have given a wide and valuable monopoly in the paint-spraying art. When an infringer suffers a judicial defeat and the circumstances make it a valuable news item, the resulting (more or less inaccurate) publicity is a typical instance of damnum absque injuria.

Specific complaint is made as to the "warning notice" which was adopted with Hopkins' consent by a manufacturing licensee in Chicago. This notice said: "Any and all pressure paint containers * * * which have one or two regulating valves and two lines of hose to air gun are an infringement, etc." Whether this claim went beyond the limits permissible to Hopkins in a public warning notice depends upon its construction. Since all known forms had one regulating valve, the language "which have one or two" very probably was intended to refer to valves located below the branching point. With that construction it is intelligible; the other construction is unreasonable. In its limited sense, it amounted only to the claim which Hopkins, acting in good faith, was entitled to make; that the forms now called 2 and 3 were within the patent. At any rate, when complaint was made of this warning, the Chicago licensees discontinued its use, after it had continued only about 30 days, and more than a year before this suit was brought. There is nothing substantial in this complaint.

It is said also somewhat vaguely that Hopkins misrepresented the actual decisions and decrees which were rendered in his favor. Tested by the criterion of good faith, this would be a different matter, because if he represented that the court had decided that forms 2 and 3 had infringed when the decision had not gone so far, it would be difficult for him to escape the charge of bad faith; but the record does not support this theory; save as the newspaper reports might have vaguely promoted that impression, it does not appear that Hopkins made any claims of this character. Even if he had, the injunction decision in the Ford Case would have justified them.

After a complete review of the record, we are satisfied that there is no sufficient reason for giving defendant any relief upon the theory of its counterclaim.

The decree below will be reversed, and the record remanded for the entry of the usual decree as to injunction and accounting upon the first form, but finding that forms 2 and 3 did not infringe. Appellants will recover the costs of this court; the costs of the court below will be awarded or divided as that court thinks proper.