692

H. W. PETERS CO., Inc., v. MacDONALD
et al.
No. 2055.

District Court, D. Connecticut.
Jan. 4, 1934.

Harold E. Cole, of Boston, Mass., for plaintiff.

C. B. DesJardins, of Washington, D. C., for defendants.

THOMAS, District Judge.

This case is now before this court upon two motions, one filed by defendants and the other by plaintiff. The defendants have moved to vacate the decree heretofore entered and for an order dissolving the injunction issued against defendant L. G. Balfour Company, withdrawing the reference to a master for an accounting, and ordering the entry of a decree dismissing the bill of complaint, with costs to defendants. On the other hand, the plaintiff has moved that the restraining order, served on it on October 13, 1932, be dissolved. These motions will be considered together.

The history of this case is as follows: Early in 1930, the plaintiff filed a bill in equity against Douglas S. MacDonald, the principal of Plainville High School, charging infringement of Peters patent No. 1,570,776, by the sale by L. G. Balfour Company of certain finger rings to the students of one of the classes, the construction of the ring in question being illustrated by Exhibit A. L. G. Balfour Company, the manufacturer, intervened as a party defendant. The case came on for trial and, on October 7, 1931, this court rendered an opinion directing that the bill of complaint be dismissed because of noninfringement. The plaintiff appealed to the Circuit Court of Appeals, and on June 13, 1932, that court reversed the decree of the District Court and held the patent valid and infringed by the Plainville High School ring, as illustrated by said Exhibit A. 59 F.(2d) 974. Thereafter, the defendants filed a petition for rehearing, which was denied. In July, 1932, the defendants filed in the Circuit Court of Appeals a petition to recall the mandate and reconsider the judgment, or to grant defendants permission to apply to the District Court for leave to amend the answer alleging, and to take testimony establishing, inequitable conduct by plaintiff in publishing and disseminating false and misleading statements regarding the decision of the Circuit Court of Appeals, such as should bar all relief to plaintiff, and for an order restraining plaintiff from similar conduct in the future. This petition was based upon affidavits charging that, following the decision of the Circuit Court of Appeals, the plaintiff had published and disseminated, by means of letters and in a newspaper, false and mis-

leading statements regarding the decision. On or about September 6, 1932, the Circuit Court of Appeals granted the alternative relief prayed in the petition. The court said (61 F.(2d) 1031):

"This is a petition to recall the mandate and reconsider our decision (59 F.(2d) 974) or, in the alternative, grant the appellees permission to apply to the District Court for leave to amend their answer alleging inequitable conduct on the part of the appellant in publishing and disseminating misleading statements said to be false regarding the decision of this court, claiming that, by reason thereof, the appellant should be barred from the relief obtained on this appeal.

"On the affidavits which have been submitted and the letters which form the basis of this application, we think the alternative relief should be granted. Leave is hereby granted to the appellee to apply to the District Court for appropriate relief in view of what has transpired since the rendition of our decision in this cause."

Thereupon the defendants, pursuant to the permission granted, moved in this court to reopen the case, and that they be permitted (1) to amend the answer to allege inequitable conduct by plaintiff, during the pendency of the suit, of such character as to bar it from all relief herein; (2) that the defendants be permitted to take testimony establishing such inequitable conduct; (3) that, when such inequitable conduct should have been established, a decree should be entered denying all relief to plaintiff; and (4) that an order be entered restraining the plaintiff from publishing or otherwise disseminating any statements regarding the decision of the Circuit Court of Appeals, or any decree entered in the District Court in pursuance thereof, which statements do not accurately indicate the precise limits of the rights of plaintiff as fixed by such decision or decree to threaten customers, or potential customers of defendant, to break or cancel contracts for the purchase of rings not involved in this suit. This motion to reopen was granted, and, on October 10, 1932, an order was entered permitting the defendants to amend the answer, setting times for the taking of depositions, and directing the issuance of a restraining order, as prayed in the motion to reopen. The restraining order was issued on October 11, 1932, and served upon the plaintiff on October 13, 1932.

The answer was amended, pursuant to leave granted, by inserting the following paragraph therein: "22. Defendants aver that, both prior and subsequent to the commencement of this suit, the plaintiff has conducted a campaign of threats of patent litigation against customers and potential customers of the defendant, L. G. Balfour Company, and that, subsequent to the decision of the United States Circuit Court of Appeals for the Second Circuit, rendered June 13, 1932, the plaintiff published, or caused to be published in a certain newspaper, false and misleading statements, misrepresenting the decision of said Circuit Court of Appeals, and wrote letters to a customer of defendant, L. G. Balfour Company, containing false and misleading statements, misrepresenting the scope of the decision of said Circuit Court of Appeals, and disseminated such false and misleading statements to other customers and potential customers of said defendant, which statements were calculated and intended to induce such customers to break or cancel their contracts with L. G. Balfour Company for the purchase of rings which do not infringe the patent in suit and were not, in any way, involved in said suit, and calculated and intended to prevent the purchase of such rings by such potential customers, all of which constitutes such unfair and inequitable conduct as to bar the plaintiff from all relief whatsoever in this Court of equity."

Thereafter, the testimony of a considerable number of witnesses was taken by deposition and in open court. At the conclusion of the hearing, counsel for defendants presented the following motion: "Now come the defendants, by their counsel, and, upon the evidence presented herein, move that an order be entered setting aside and vacating the interlocutory decree heretofore entered in this cause, dissolving the injunction heretofore issued against the defendant, L. G. Balfour Company, and withdrawing the reference to a master for an accounting of profits and damages, and that a decree be entered dismissing the bill of complaint with costs to defendants."

The case is thus before this court upon all the evidence to determine whether the facts, as shown by such evidence, require the denial of all or further relief to plaintiff, as prayed by defendants' motion to vacate the decree.

Following the hearing, the plaintiff filed a motion to dissolve the restraining order, served on it on October 13, 1932, alleging that the defendants had suppressed, in the affidavits filed with the Court of Appeals, two letters written by L. G. Balfour Company to the superintendent of Pittsfield High School, which letters were said to be material, and,

further, that the defendants induced Charles H. Fraser to sign and swear to a false affidavit, which was used before the Court of Appeals.

Defendants contend that the evidence shows conduct by the plaintiff, subsequent to the decision of the Court of Appeals, which is so unconscionable and inequitable that plaintiff should be denied all relief in equity in accordance with the ancient maxim of equity that he who comes into equity must come with clean hands. Pomeroy, in his Equity Jurisprudence (3d Ed.) § 397, discusses the application of this maxim, and the author says:—

"This maxim is sometimes expressed in the form, He that hath committed iniquity shall not have equity. * * *

"On the other hand, the maxim now under consideration, He who comes into equity must come with clean hands, is much more efficient and restrictive in its operation. It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him all recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy."

This principle has been applied in patent and trade-mark suits where the misrepresentation or inequitable conduct related to the patents or trade-marks involved. Manhattan Medicine Co. v. Wood, 108 U. S. 218, 2 S. Ct. 436, 27 L. Ed. 706; Panay Horizontal Show Jar Co. v. Aridor Co. (C. C. A. 7th) 292 F. 858; General Excavator Company v. Keystone Driller Company (C. C. A. 6th) 62 F.(2d) 48, 49, affirmed by the Supreme Court of the United States and decided December 4, 1933, 54 S. Ct..146, 78 L. Ed. ——. While in general this principle has been applied where the hands of the plaintiff were unclean at the inception of the suit, there seems to me no reason why it should not be applied at any time during the pendency of the suit and while a party is an actor seeking to obtain some remedy from the court. Such was the view expressed in General Excavator Co. v. Keystone Driller Co., supra, wherein Judge Hickenlooper, speaking for the Circuit Court of Appeals, said: "Doubtless a party may be guilty of such unconscionable conduct during the progress of litigation that a court of equity will refuse him further relief, but in respect of antecedent action it is as of the date of the filing of the bill of complaint that his conduct must be appraised."

So, also, a continued campaign of threats of patent litigation against users of a competitor's device has been held to constitute conduct so unconscionable and inequitable as to warrant the interposition of a court of equity. Adriance, Platt & Co. v. National Harrow Co. et al. (C. C. A. 2d) 121 F. 827, 830. In this case Judge Wallace said, in speaking of the communications warning the complainants' customers against selling its harrows: "We are satisfied that they were sent, not for the purposes of self-protection, but in execution of the defendant's threat to stop the complainant from building harrows by other means than legal remedies."

Nor will a patentee, in advance of adjudication, be permitted to harass or obstruct a rival. Such a patentee would be held to have come into court with unclean hands. Gerosa et al. v. Apco Manufacturing Co. (C. C. A. 1) 299 F. 19. So, also, the publication of misleading statements in a patent suit while an accounting was pending, regarding the scope of an interlocutory decree, especially where they disclose a purpose to injure the competitor's business, was restrained by an order in the very suit itself. Rollman Manufacturing Co. v. Universal Hardware Works (D. C.) 229 F. 579. This procedure was followed by Judge Hand in Asbestos Shingle, Slate & Sheathing Co. et al. v. H. W. Johns-Manville Co. (C. C.) 189 F. 611, 614, a widely cited decision and one particularly relied on by defendants. This case clearly holds that a restraining order may be entered in the suit, and also that, where a complainant misuses a decree, the court may even modify that decree as justice requires. Judge Learned Hand said: "There is no indication in the case that the complainant has acted in conscious bad faith, yet at the same time it is quite clear that in order to protect its supposed rights under the patent it has in fact misstated the contents of the decree in part. None of the cases, whether the application was in the original suit or by plenary bill, seem to raise the precise facts here at bar, but I take it there can be no question that a trade injury is actionable when it arises from actual misstatements. Judge Blodgett's opinion in Emack v. Kane (C. C.) 34 F. 46, which has been much cited and the decision of the Circuit Court of Appeals of this circuit

in Adriance, Platt & Co. v. National Harrow Co., 121 F. 827, 58 C. C. A. 163, were both weaker cases for the aggrieved party than this; indeed, in the latter case, Judge Coxe, who had dismissed the bill, mentions the fact that there was no false statement of fact in any of the circulars. I think there can be no reasonable dispute of the rule that any false statement of the contents of the decree would require some action."

The opinion then goes on to state what relief should be had against the offending parties. Judge Hand said:

"In view of all these facts I think the complainant should say expressly what are the limits of his rights as fixed by the decree. * * *

"The order will not contain any provision for its enforcement, but if the complainant disobey its terms, the defendant may apply for a stay of any proceedings under the interlocutory decree, and if necessary that the decree may be recalled. It is not necessary to decide here whether any attachment could issue if these sanctions prove insufficient. I mean only to decide now that, if a complainant misuses the decree of the court, the court may so modify that decree as justice requires to control such misuse. What might be the case after expiration of the term in which final decree was entered need not be considered."

■■■ There is therefore ample power in this court to prevent misuse of its decree and to prevent unlawful interference with the business of an injured party, either by restraining order, by modification of the decree, or both, and the question before the court, now, is whether or not the conduct of plaintiff, complained of herein, has been of such a character as to disentitle it to the relief awarded to it by the interlocutory decree and also whether it has been such as to warrant the continuation of the existing restraining order. Out of the mass of evidence I have decided to discuss certain of the specific instances of alleged misrepresentations relied on and which may be considered representative of the plaintiff's conduct in general.

### The Dedham Transcript Publication.

This article was published immediately after the decision of the Circuit Court of Appeals upholding plaintiff's patent and ordering an accounting. It was subsequently retracted at the request of the plaintiff. No doubt, it had its origin in the mind of Mr. Peters, president of plaintiff corporation, who, in the first flush of victory, was eager for publicity. The article in question stated that the award in this suit "substantiates the Peters' patent right on stone-protected rings, * * *" which statement defendants say is false. It also stated that said award "includes damages to the Peters Co. to the amount of $22,000.00." That assertion, defendants say, is untrue, and, of course, it was untrue; since, in point of fact, the decision of the Court of Appeals merely sustained the Peters' patent as covering a certain type of ring construction (Exhibit A), and reversed the decree below. Finally, defendants assert that the entire article conveys the impression that the effect of the decision was to give the plaintiff a monopoly of stone-protected rings, which was also misleading. Defendants sought to prove that the article was based upon, if not copied, by Mr. Fraser, editor of the Dedham Transcript, from a written statement furnished by Mr. Peters. On behalf of Peters this is denied, and from the proofs it is not clear just what statement Peters did make. The original statement was identified by the witness Fraser while his deposition was being taken, but neither defendants nor the plaintiff saw fit to offer it in evidence, nor was Peters called as a witness on the subject. Whether Peters said in the statement that there already had been an award of $22,000, as claimed by defendants, or whether, as claimed by plaintiff, Peters merely said that he estimated that there would in the future be an award of damages in this amount, is not clear. Admitting that Mr. Peters instigated this publication, I consider the incident of relatively small consequence, especially as it appears that the Dedham Transcript is a small town newspaper, having a circulation of only 2,700 copies. The statement in the article that the decision substantiated Peters' right to "stone-protected rings" is undoubtedly misleading, but may be excused, as Mr. Peters may well have believed, at that time, that his patent, as construed by the Court of Appeals, conferred upon his company, for the duration of the patent, a monopoly on all "stone-protected" rings, and, under the circumstances, I am unwilling to find that, in expressing that opinion so soon after the decision, plaintiff acted in bad faith, especially since the term "stone-protected" rings is not clearly definable. Defendants produced evidence to show that the term "stone-protected" rings as used in the trade is a broad one, and that it comprises any ring having a stone which is protected against breakage by the metal around it and an emblem above it. On the other hand, plaintiff insisted that, prior to the decision of the Court of Appeals in its favor,

there were no "stone-protected" rings on the market other than those of the patent in suit made by plaintiff and the infringing rings "Exhibit A" made by the defendant L. G. Balfour Company. I am not impressed with the evidence on this subject and feel that the term needs further definition and clarification.

■ I therefore hold that defendants have not proved by a preponderance of the evidence that the Dedham Transcript article was instigated or caused to be published by plaintiff in bad faith or with the intention of deliberately misleading the public by misrepresenting the decision of the Circuit Court of Appeals, or that it had any such effect. Defendants have admittedly suffered no injury from this publication other than unfavorable publicity, and that is clearly damnum absque injuria. In this connection, reference may be made to the case of Alliance Securities Co. v. De Vilbiss Mfg. Co., 41 F.(2d) 668, 671 (C. C. A. 6th), wherein Judge Denison, speaking for the court, used the following pertinent language: "When an infringer suffers a judicial defeat, and the circumstances make it a valuable news item, the resulting (more or less inaccurate) publicity is a typical instance of damnum absque injuria."

Pittsfield High School Correspondence.

This instance of alleged unfair conduct is more serious as being an attempt by plaintiff, immediately after the decision of the Court of Appeals sustaining the patent, to interfere with a contract between defendant L. G. Balfour Company and a class of the Pittsfield High School. This interference took the form of letters to the principal of the high school which referred to said decision as definitely covering all "stone-protected" rings, and which by implication threatened the principal with suit for infringement if he should go through with his contract with the Balfour Company.

It appears that the class graduating in February, 1933, had ordered in June, 1932, from defendant a certain class ring, illustrated in the drawing marked in evidence, Defendant's Exhibit D-19, and which defendants claim does not infringe the Peters' patent.

Immediately following the decision of the Circuit Court of Appeals, the plaintiff wrote Mr. Strout the letter, Defendants' Exhibit D-10, in which it said, regarding the decision: "This decision, therefore, covers all infringers and I must necessarily demand that you deal only with those lawfully allowed to make your merchandise. Please do not allow anyone to involve you in litigation which (with those who care for no rights of others), will be the result of your dealings with anyone else."

On June 20, 1932, Mr. Strout wrote the plaintiff the letter, Defendants' Exhibit D-11, in which he said: "Believing this, there is but one interpretation which I can apply to your letter and that is that you are attempting to intimidate me to the extent that I will withdraw the order from L. G. Balfour."

On the same date, Mr. Strout wrote L. G. Balfour Company the letter, Defendants' Exhibit D-12, in which he required that the Balfour Company should give him "some assurance that you will be able to deliver the order in accordance with our agreement."

On June 22, 1932, the plaintiff, by Mr. Peters, wrote Mr. Strout the letter, Defendants' Exhibit D-13, in which he said: "I notified Mr. Balfour by registered mail on June 14th not to ship any more stone-protected rings according to the decree handed down by the U. S. Federal Court in New York in which the said Court of Appeals said, Balfour is infringing on both claims of our patent #1,570,776. It is just as unlawful for a concern to deliberately continue to manufacture stone-protected rings when notified by a gentleman that he has been awarded the decision on an infringement suit pending in the courts 2½ years as it is to do any other unlawful act, no matter what it may be."

This letter concluded with the following postscript: "Get Mr. Balfour to sign a statement that he will pay $4.00 per ring for every ring delivered if demanded by Mr. H. W. Peters for alleged infringement."

This letter of June 22, 1932, defendants say, was a clear attempt to induce Mr. Strout to cancel the Pittsfield High School contract with the L. G. Balfour Company, by trying to make him believe that the decision, in this suit, covered all stone-protected rings. Although the contract was not cancelled,—on June 23rd and 24th, L. G. Balfour Company wrote Mr. Strout two letters, Defendants' Exhibits D-14 and D-15, assuring him that the company would protect him,—this circumstance does not in the least excuse the plaintiff or mitigate the wrong.

I need not pass upon the question of infringement raised by this Pittsfield High School ring (see Exhibit 19), as defendant, L. G. Balfour Company, is entitled to its day in court on that issue; in my judgment, however, it would have been far better for plaintiff to have warned the manufacturer of

the ring rather than to harass a school superintendent who must of necessity, as was done in this instance, refer the entire matter to the manufacturer, the L. G. Balfour Company.

I cannot resist the conclusion that the letter of June 22, 1932, was an inexcusable act of impertinence, intended by plaintiff to place unlawful difficulties in the path of L. G. Balfour Company, with respect to the fulfillment of an order which had already been placed with that company by the senior class of the Pittsfield High School, and that it was, in effect, an act of intimidation on the part of plaintiff intended to compel the principal of the high school to bring about a cancellation of this Balfour contract.

I do not consider it necessary to discuss the other instances of unfair conduct occurring prior to the petition to recall the mandate.

Coming now to the alleged conduct of plaintiff subsequent to the petition to recall the mandate, I find here a still more serious situation.

### Court of Appeals' Opinion.

This is, in my opinion, another serious case of misrepresentation. Defendant has introduced in evidence as Exhibit D–16 a printed document in pamphlet size indorsed "Long Awaited Decision of United States Circuit Court of Appeals for the Second Circuit, H. W. Peters Co., Inc., v. L. G. Balfour Co., (Patent infringement suit)," and which the average person would believe to be a true copy of the decision as it was actually handed down by the court. At least that would be the reaction of one unfamiliar with court decisions. The evidence shows that this pamphlet was published by plaintiff and made available for distribution by its salesmen. The record shows several instances in which a copy of this pamphlet was given by plaintiff's salesmen to some one interested in class rings, and it is a fair inference that plaintiff intended the pamphlet to be distributed generally. It appears that this opinion was not copied in its entirety, and that it contained parenthetical explanatory remarks evidently added by plaintiff to convey the impression that the Circuit Court of Appeals had definitely and expressly held the patent in suit to cover all so-called stone-protected rings. For instance, on page 2 of the pamphlet, after the names of the Circuit Judges, the words "stone-protected" were inserted. This will be made clear from the following excerpt:

"Before: (Judges of the United States Circuit Court of Appeals) Manton, Swan and Chase, Circuit Judges.

"Appeal from the District Court for the District of Connecticut. Suit filed for infringement of patent No. 1,570,776, (H. W. Peters) for a (stone-protected) finger ring. Decree for defendant; plaintiff appeals. Reversed (In Favor of H. W. Peters)."

Such an instance of misrepresentation cannot and will not be tolerated by this court on the part of one seeking relief in a court of equity.

At the end of the second paragraph of the opinion, the following explanatory note appears: "(Judge explains, as part of his decision, old methods used prior to H. W. Peters' invention. This is the old drilled stone, or mounted onyx ring, which will be offered to you by concerns not licensed by Mr. Peters.)"

It is charged by defendants, and justly so, that this explanatory remark was inserted by plaintiff in order to create the impression that the only stone rings other than the protected stone rings covered by the patent were the drilled stone rings; also that the same impression is created by the insertion "on the old mounted stone ring" at the beginning of the next paragraph. Attention is called also to still another alleged misleading explanatory note which consists of the following: "(Note the features outlined by Judge Manton which are parallel to claims made by Peters' representatives. Note how the Judge brings out the savings effected by Mr. Peters' new methods. These savings in themselves denote 'invention.' This was immediately recognized by competitors who disregarded the inventor's rights and made a stone-protected ring. It may be said here that Mr. Peters has many patents believed to cover any practical basic method of making stone-protected rings.)"

Defendants assert that the effect of this explanatory remark is to make the readers believe that Judge Manton approved Mr. Peters' claims generally, and that his patents covered all practical methods of making stone-protected rings. All of these so-called explanatory remarks inserted in the body of a judicial opinion deserve to be rebuked as misrepresentations of that opinion and as being calculated to prevent, without judicial authority, the sale by competitors of all rings of this general type.

Also, the addition of an immaterial, if not irrelevant, paragraph from what purports to be a master's report in O'Neil v.

Peters is properly criticized by defendants who claim that, by adding this to the last page of the pamphlet, plaintiff intended to create the impression that it was a part of the decision of the Court of Appeals. I agree that this is so, and, after due consideration, have unhesitatingly reached the conclusion that the preparation, printing, and distribution to the trade of this pamphlet by the plaintiff amounted to, and must be characterized as, a flagrant misuse of the decision of the Circuit Court of Appeals.

I have not overlooked the note at the end of the pamphlet by which plaintiff undertakes to differentiate, for the enlightenment of the reader, between the so-called explanatory notes and the "actual opinions," handed down in the Balfour and O'Neil Cases respectively. This note, however, tends to confuse and aggravate rather than clarify the situation, and would not in any event excuse the above-described misuse of the opinion of the Circuit Court of Appeals.

One other instance of misrepresentation by the plaintiff will be referred to in this opinion, i. e., plaintiff's letter of September 14, 1932, to its salesmen.

### Letter of September 14, 1932.

On September 14, 1932, the plaintiff wrote a certain letter to its salesmen, of which two copies are in evidence as Defendants' Exhibits D–8 and D–26. Exhibit D–8 was produced by Bishop, the plaintiff's Pittsburgh salesman, and Exhibit D–26 was produced by Owens, the plaintiff's South Carolina salesman. The first sentence of this letter refers to stone-protected rings, as follows: "It is evident that many contracts were taken by concerns other than Herff-Jones Co. and ourselves on the stone-protected ring."

Then the letter continues: "Because of a recent litigation with the L. G. Balfour Co., through which the Courts handed down to us a decision denoting infringement on their part of our patent rights, it would appear to me that you should see the Principal of these schools and tell them that we will continue the manufacture of this stone-protected ring, duplicating the style and price; or taking over the contract, so that the pupils may continue to buy a ring that is now a national affair—A Stone-Protected Victory Ring."

This paragraph, written by plaintiff (not immediately after the decision of the Circuit Court of Appeals, but after time for reflection and advice from counsel), taken as a whole, conveys the impression that the deci-

sion had definitely and expressly held all stone-protected rings to be infringements. Moreover, I agree with defendants that this paragraph contains direct suggestions to the salesmen to break Balfour contracts because of the decision. The last paragraph of this letter is especially open to criticism and reads as follows: "You have the right to say that the Balfour Co.—under penalty of the Federal Court, and according to an injunction issued by the Court—cannot manufacture this type of jewelry. Therefore, these contracts no longer exist in the form of a Balfour contract but do exist, if the school insists upon buying a stone-protected ring, in the form of a Peters contract."

This letter can only mean that the decision in the Balfour suit had held that the L. G. Balfour Company could not manufacture stone-protected rings or "this type of jewelry." It directs the salesmen to tell the principal of the school buying rings of this type from the L. G. Balfour Company that such contracts did not exist. This letter tells the salesmen, in so many words, to use the decision in this suit in an attempt to induce Balfour customers to break or cancel their contracts with the Balfour Company. Moreover, this letter refers to an injunction issued by the court, whereas no injunction was issued in this suit until October 10, 1932. This letter constitutes, in my opinion, another flagrant misrepresentation and misstatement of the decision and decree in this suit. It is worthy of notice that this letter was not withdrawn, but was used by salesmen of plaintiff, with its consent, even after the service on October 13, 1932, of the restraining order herein, proving a deliberate intention on plaintiff's part to continue its misrepresentation of the scope of the Court of Appeals' decision regardless of consequences.

Not only did the plaintiff misrepresent the decision of the Court of Appeals in written documents as hereinbefore described, but the evidence clearly shows that Mr. Peters himself indulged orally in misleading statements regarding the decision and decree.

For instance, on December 13, 1932, it appears that Mr. Peters called on Henry M. Stewart of the class ring committee of the Virginia Military Institute at Lexington, Va., and told him that no company could make a protected stone ring, and that he had basic patents on that type of ring. Mr. Stewart quoted Mr. Peters as making the following statement: "No, they cannot put in the stone from the inside or the outside. We have all the basic patents on it. When I invented this

I offered to let these other companies in on it if they would pay a royalty. They wouldn't pay a royalty but now they are going to pay me. I have got Balfour for $30,000 and I am going to get the rest of those boys."

On December 15, 1932, Mr. Peters called upon John N. Hoffman, Jr., who quoted Mr. Peters as saying: "We had gone to the Balfour Company about a year previous and they revised all of our prices more consistent with general conditions, and I felt at that time prices had been reduced to practically the lowest that could possibly be done, and I told him so. 'Why' he says, 'we will guarantee that, besides,' he said, 'the Balfour people are very poor people to do business with.' He says 'I have just sued them for infringing my patents and I have obtained a judgment of $15,000. in the Federal Court, and Mr. Balfour has offered to settle for $5,-000.' I said 'What is this suit you are talking about?' He said 'It is on stone-protected rings.' "

Mr. Peters was not produced as a witness to controvert any of these statements, and they must, therefore, be taken as true.

I do not deem it necessary to discuss further the voluminous evidence taken by the parties on this issue, as I am satisfied from the evidence discussed in this opinion that the conduct of the plaintiff, as hereinbefore set forth, has been so inequitable as to call for some action by this court.

Defendants have proved to my satisfaction that plaintiff has, since the day the decision of the Court of Appeals was handed down, carried on a campaign of publishing and disseminating misleading statements regarding the scope and effect of the decision of the Circuit Court of Appeals and the decree entered in this court pursuant thereto, and I am satisfied that plaintiff has endeavored to induce customers to break or cancel contracts with defendant by means of intentionally misleading statements, both oral and written, and that plaintiff has acted recklessly and with a disregard for accuracy and truth, thus bringing itself within the rule laid down by Judge Hand in Asbestos Shingle, Slate & Sheathing Co. et al. v. H. W. Johns-Manville Co., supra.

In support of its motion to dissolve the restraining order, plaintiff sought to prove that defendant misled and deceived the Circuit Court of Appeals by suppressing a portion of the Pittsfield High School correspondence in order to convey the impression that an order for rings, placed by the school, was not filled; also that said defendant prepared and induced Mr. Fraser, editor of the Dedham Transcript, to sign a false affidavit giving him, at the same time, a release of any claim the Balfour Company might have against him for the publication of the article heretofore mentioned. The proofs do not, in my opinion, sustain these charges.

In arriving at the final decision of this case, there are no clear guiding beacons of pertinent recent authorities which are decisive of the questions at bar, and this is due largely to the fact that in no two cases are the facts exactly similar; hence an approach must be made from basic principles.

 Unfair tactics are reprehensible even in actions at law, but equity demands even more exacting standards of behavior. The litigant at law should have clean hands; in equity he must. And this being true as a condition precedent to entering equity, it is equally certain that his hands must stay clean to remain in equity and claim equitable relief, and his sojourn in equity certainly does not relax the standard initially required.

If this standard is not met by a litigant, equity must either deny relief in toto, or partially, according to the aggravation presented, or confess its maxims obsolete. What are "clean hands" in equity? To consider the literal words throws light. A surgeon about to operate demands absolute cleanliness. But one merely lacking such freedom from contamination does not fairly lack "clean hands." The strict standards of the surgeon are not demanded in everyday life. Turning from the metaphor of the maxim to its application in practice, we have on the one hand the mere deviation from rectitude which, though regrettable, must be expected in transactions in which the parties are swept by partisan zeal. In the large, such incidents are a mere badge of human frailty which cannot be too harshly dealt with. Such hands are not surgically clean, but cannot justly be condemned as dirty.

On the other hand, we sometimes face conduct of such deliberate and selfish unfairness as to incite, even in the charitably inclined, the characterization of a "dirty trick." The author of such conduct, in an equity suit, does not have clean hands. Border line cases may occur, but their consideration does not herein seem necessary. The question, then, is whether or not plaintiff's conduct has those traits of calculated injustice which equity can afford neither to condone or ignore.

The facts established here write a story which cannot be lightly dismissed. It is branded with unfairness, and, if this court is

to reward the responsible party with the sweeping relief sought, then we may as well confess that equity has at least one less maxim.

After careful consideration and weighing the evidence, I have decided not to recall the decree heretofore entered in its entirety, and not to disturb the provisions thereof upholding the patent and granting an injunction. Substantial justice will be accomplished by recalling so much of the decree, however, as awards an accounting, the right to which plaintiff has forfeited by reason of its inequitable conduct as hereinbefore set forth. Defendants' motion to vacate the decree is granted to that extent, and plaintiff's motion to dissolve the restraining order is denied.

Appropriate orders in accordance with the above views may be submitted, properly consented to as to form, and, if the parties are unable to agree as to form, then the orders may be settled before me on proper notice.