**ART METAL WORKS, Inc., v. ABRAHAM & STRAUS, Inc.**

**No. 341.**

Circuit Court of Appeals, Second Circuit.

April 30, 1934.

See, also, 69 F.(2d) 102.

Blair, Curtis & Dunne, of New York City (Robert S. Blair, Edward F. Dunne, Jr., William T. Kniesner, and Milton C. Weisman, all of New York City, of counsel), for appellant.

Ward, Crosby & Neal, of New York City (Joseph Lorenz, Kenneth S. Neal, and Martin W. Littleton, all of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

After the affirmance of an interlocutory decree entered below granting an injunction and an accounting, and holding the Aronson patent, No. 1,673,727, for a lighter, valid and infringed [Art Metal Works, Inc., v. Abraham & Straus, Inc. (C. C. A.) 61 F.(2d) 122], the court permitted the appellant to file an amended answer. This answer set forth allegations of inequitable conduct by the appellee in misrepresenting to the trade, including appellant's customers, the scope and effect of the decision rendered by this court. The various methods of accomplishing this result have been set forth.

In granting the appellant's motion for permission to apply to the District Court for leave to file an amended answer, we said:

"We are satisfied from the affidavits presented that there has been misrepresentation both by salesmen and written communications to customers of the manufacturer as well as by advertising in the trade papers." Art Metal Works, Inc., v. Abraham & Straus, Inc. (C. C. A.) 62 F.(2d) 79, 80.

In granting leave to file the answer, the District Judge, after a review of the affidavits and exhibits, stated:

"The defendant makes by far the more impressive showing, and indeed the Circuit

L. HAND, Circuit Judge, dissenting.

Court of Appeals was so convinced. If there were any question open in that regard, it would be dissipated by a consideration of the plaintiff's advertising matter. It seems to me that the misrepresentations, which apparently were deliberate, though they may have resulted from overzealousness on the part of plaintiff's executives, adds strength to the defendant's contentions that the misrepresentations of the salesmen were not innocent. * * *

"The probable effect of the foregoing was to mislead the trade in respect to the scope and effect of this litigation.

"The plaintiff's conduct was reprehensible.

"To what extent it has damaged the Evans Company is, of course, a matter that cannot be decided on this motion, but that some damage resulted seems obvious." Art Metal Works, Inc., v. Abraham & Straus, Inc. (D. C.) 2 F.Sup¹ .92, 293. ·

After a hearing, the relief prayed for was denied by the court below because the appellant had failed to establish bad faith on the part of the appellee and a decree was entered accordingly. Art Metal Works, Inc., v. Abraham & Straus, Inc. (D. C.) 4 F. Supp. 298. This appeal seeks a review of that decision.

Patent No. 1,673,727 was for a cigar lighter, and this court held that it was infringed by the lighters, "Evans Automatic" and "Evans Roller Bearing," manufactured by the Evans Case Company and sold by the appellant. We did not hold, in that decision, that all automatic lighters, or that the Evans new Trig-a-lite infringed. The Evans Case Company, manufacturers of the lighters, are openly defending this suit.

■■ After this court's decision, the president of the Evans Case Company interviewed the appellee's president and suggested a compromise, stating, "I think we would be better off making lighters than fighting," to which answer was made, "Further, I want to say to you that there isn't room for two of us in the lighter business * + * I have found out in my business experience if you make competition expensive enough the competitor won't stay in business very long." Although this was said in the presence of another officer of the appellee, that witness was not called, and, while the version of the appellee's president is given by him, the threat of the statement above quoted is not denied. With an apparent determination to eliminate the Evans Case Company as a competitor in the manufacture and sale of lighters, the appellee proceeded and went beyond reasonable limits or rights acquired by its patent litigation and entered upon a campaign of misrepresentation in circulars, in advertisements in trade papers, and through its salesmen and representatives. We think it forfeited its right to the protection of a court of equity. Gerosa v. Apco Mfg. Co., 299 F. 19 (C. C. A. 1); Perfection Mfg. Co. v. B. Coleman Silvers Co., 270 F. 576 (C. C. A. 7). An owner of a patent has a right to protect his patent in accordance with the statute under which he is granted a monopoly. He may protect his business under the patent from the attacks of infringers. He may, to this end, advertise truthfully and in good faith the extent to which the courts have granted him protection against an infringer. He may proceed against other infringers and say in advance that he intends to do so. But no court should continue to protect patent rights while the patent owner is representing to his customers, and to his competitor's customers, that he has been awarded more rights or protected to a greater extent than the court has actually decreed. Courts cannot permit unfair practices to go on to harass or obstruct a rival in business. Panay Horizontal Show Jar Co. v. Aridor Co., 292 F. 858 (C. C. A. 7); Luten v. Wilson Reinforced Concrete Co., 263 F. 983 (C. C. A. 8). Attacks inspired by a desire to unlawfully intimidate purchasers, who might lawfully buy other than the patented article, which results in substantial loss to the infringer, places the patent owner in the class of suitors with unclean hands.

After the decision of this court, the appellee on August 23, 1932, sent a telegram to its salesmen and representatives announcing a "sweeping victory" against the Evans Case Company, expressed their delight, and said it was "okay to advise your trade but be careful not to indulge in any threats until definite plan of campaign for damages is completely worked out." The next day instructions were sent by letter to salesmen which, among other things said:

"It must be borne in mind by you that this decision naturally covers not only the pocket form of lighters but also their combinations, whether in sets or as units imitating our Tuxedo. It covers also their table lighters.

"Steps will be taken by us immediately to notify all trade by means of letters, also through full page announcements in the trade papers. We will also take steps without delay to proceed against the manufacturers of the Marathon lighter and the Golden Wheel

lighter, with a view to obtaining injunctions preventing their further infringement of our adjudicated patent. * * *

"The Evans Case Co., also their customers are now liable to us for all the tremendous damage which they have done to us during the past years in their sale of infringing products. Naturally, we are keenly alert to the necessity of recovering every possible penny of this damage so that the trade may understand it is not desirable for them to push the sale of infringements even where they can buy and sell them at low prices."

The decision did not cover cigarette case and lighter sets. Thus portraying the plan of campaign to the salesmen, they proceeded to write to the trade, and, on August 24, 1932, they sent to many of the Evans Case Company customers a telegram referring to their "sweeping victory on every point involved in our suit against the Evans Case Company," and announced that further details would follow this telegram and promptly convey this information to them. The telegram was followed on August 25th and 26th with circular letters advising the trade that "Evans lighter and others of similar construction constitute infringements of our patent" and that it was their purpose to proceed with an accounting for profits made by the infringers and substantial damages would be asked for past infringements to which they had been subjected.

"Furthermore, we must advise the trade that any further sale of these Evans lighters or others of similar construction now becomes illegal according to the decision of the Court of Appeals."

This reference to others of similar construction had its intended effect upon the trade as testified to by witnesses. In substance it conveyed to members of the trade and they understood, so they testified, that the decision covered all other automatic lighters and not merely the Evans automatic lighter and roller bearing lighter. Witnesses who bought lighters, questioned as to their understanding of this statement and its effect, said they believed that all automatic lighters would infringe and that they could no longer handle any automatic lighters except those made by the appellee or otherwise made under the patent. One witness said a representative of the appellee told him, after showing him a circular letter, that not only must he not sell the Evans lighters which he had on hand, but he could not sell the Golden Wheel lighter for the patent rights covered "any automatic lighters, Evans or Golden Wheel

or any automatic lighters." While some witnesses said they were not misled, still there was ample evidence that this misrepresentation caused many customers to be deceived. In trade journals, appellee, in its advertisements, announced to the trade that its patent covered cigarette case and lighter sets and that all infringers would be vigorously prosecuted; although one of its officers testified that he knew cigarette case and lighter sets were not manufactured under the patent. The testimony of buyers indicates that they thought that anything pertaining to Ronson (the name of appellee's product), lighters, cigarette cases, or combination cases, infringed, and this was the result of representations made by sales agents to them. The Evans Case Company customers refused to buy any lighters from them and returned some.

The Evans Case Company had another automatic lighter, the Trig-a-lite. Appellee sued for infringement because of the manufacture and sale of this lighter. The District Court has held that that lighter did not infringe. We have affirmed that decision this day (70 F.(2d) 639). But the appellee wrote its trade claiming that it did infringe. It was of different construction. The claim that it did infringe could only be based upon the thought that that patent covered "any kind of automatic lighter." Indeed, registered letters were sent out making this statement to customers of the Evans Case Company in an attempt to prevent sales of that lighter. In the trial of this patent case, appellee's expert and counsel maintained that a spring actuated lighter (Trig-a-lite) was different in substance from the appellee's patented lighter. This was done to avoid prior art references and a contrary claim could not be consistently made.

After advertising, their salesmen and representatives carried on a campaign against those who had purchased from the Evans Case Company. The salesmen and representatives called upon the trade; the record shows that seven different representatives of appellee in six large cities made about the same oral representations, indicating a concerted action and a common plan. Indeed, it was stated by some that the president of the appellee was "out to break Reilly" (president of the Evans Case Company); that Mr. Aronson, president of the appellee company, was a man of substantial wealth and that he would fight to the finish to get Reilly. It was stated that, because of the victory in the patent litigation, the appellee was alone in the field and that all lighters were an infringement upon their product;

that the customers could not sell automatic lighters except appellee's, and the only lighter they could handle, if they wanted to, was the appellee's. The result was that some of the customers of the Evans Case Company removed from their catalogues combination lighters and lighter sets manufactured by the Evans Case Company and instructed their branch houses to discontinue the sale of Evans lighters and sets. One customer said the agent told him, "You are not allowed to sell any automatic lighters, Evans or Golden Wheel, or any automatic lighter." And another buyer said an agent told him, "They claimed that under their patent they will not have the privilege of selling the said cases and lighters." It is unnecessary to recite in detail these misrepresentations. But it is sufficient to say that the campaign threatened was carried on and the appellant established that the appellee, by its circular letters, registered letters, and advertisements, and by representations made by its agents, has misrepresented the scope and effect of this court's decision in the patent case.

Good or bad faith is to be judged only by the spoken word and conduct of the parties; the charge of bad faith is amply supported by the evidence. The District Court was of the opinion that the appellee was not bound by the agents' acts and statements; that knowledge thereof must be shown to the appellee as well as its bad faith. The master is bound by torts committed by his agent when acting within the real or apparent scope of his authority, and liability is not limited to torts resulting from acts which he has expressly authorized or directed. He is liable for any of the torts which the agent commits in the course of his employment, even though he was ignorant thereof, and the agent in committing the acts exceeded his actual authority or even disobeyed direct instructions of his principal. Washington Gas Light Co. v. Lansden, 172 U. S. 534, 19 S. Ct. 296, 43 L. Ed. 543; Dysart v. Missouri, K. & T. Ry. Co., 122 F. 228 (C. C. A. 8); Blumenthal v. Shaw, 77 F. 954 (C. C. A. 3). Here the agents were expressly authorized to visit the trade, solicit business, give information concerning appellee's lighter, and they were acting at the time for their principal and within the scope of the business intrusted to them. The plan of campaigning for business and the misuse of the court's decision in the patent litigation was planned for them. It was all part of the "campaign for damages." It was the pursuit of the policy of molestation, of driving the appellant's

manufacturer out of business. The right of fair competition did not justify the acts committed. Evenson v. Spaulding, 150 F. 517, 9 L. R. A. (N. S.) 904 (C. C. A. 9). What the agents said and did was consistent with and in consequence of the instructions given to them, to advise the trade of the "sweeping decision" and to use the "decision as a tremendously powerful influence." The widespread use of circulars with notices charging infringement, some followed by suit and others not, and the subsequent suit against the Trig-a-lite lighter as an infringement, was inspired by a purpose to intimidate the Evans Case Company customers, to coerce them to refrain from purchasing from others, and to compel them to buy all automatic lighters from the appellee. Adriance, Platt & Co. v. Nat'l Harrow Co., 121 F. 827 (C. C. A. 2). Such inequitable conduct, after the decree of validity and infringement, is sufficient to deprive the appellee of its injunction and the accounting order to determine damages. See Alliance Securities Co. v. De Vilbiss Mfg. Co., 41 F.(2d) 668 (C. C. A. 6); De Forest Radio Tel. & Tel. Co. v. Radio Corp. of America (D. C.) 4 F.(2d) 134; Asbestos Shingle, S. & S. Co. v. H. W. Johns-Manville Co. (C. C.) 189 F. 611.

In Keystone Driller Co. v. General Excavator Co., 290 U. S. 240, 54 S. Ct. 146, 147, 78 L. Ed. 293, the rule was stated that one coming into a court of equity must do so with clean hands, and, after quoting from Story's Equity Jurisprudence (14th Ed.) § 98, that the court will refuse to interfere in his bill if he does not, the court said:

" 'To aid a party in such a case would make this court the abetter of iniquity.' Bein v. Heath, 6 How. 228, 247, 12 L. Ed. 416. And again: 'A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.' Deweese v. Reinhard, 165 U. S. 386, 390, 17 S. Ct. 340, 341, 41 L. Ed. 757."

Applying that principle of equity, the appellant should have had granted the relief asked for in its amended answer to the extent of denying injunctive relief as well as an accounting.

Decree reversed with costs, and a decree will be entered in accordance with this opinion.

L. HAND, Circuit Judge (dissenting).

Federal courts have said at times that the successful plaintiff in a patent suit might so misuse his decree that they would vacate it [Alliance Securities Co. v. De Vilbiss Mfg. Co., 41 F.(2d) 668, (C. C. A. 6); Asbestos Shingle, etc., Co. v. Johns-Manville Co. ·(C. C.) 189 F. 611; De Forest Radio, etc., Co. v. Radio Corporation (D. C.) 4 F.(2d) 134]; but, so far as I can find, they have only once acted upon the doctrine [H. W. Peters Co. v. McDonald (D. C.) 5 F. Supp. 692]. However, in the closely analogous situation of a bill to enjoin a patentee from misrepresenting his rights, when he refuses to test them in court, there have been a number of successful efforts. Farquhar Co. v. National Harrow Co., 102 F. 714, 49 L. R. A. 755 (C. C. A. 3); Adriance, Platt & Co. v. National Harrow Co., 121 F. 827 (C. C. A. 2); Racine Paper Goods Co. v. Dittgen, 171 F. 631 (C. C. A. 7). This doctrine appears to take its source from Judge Blodgett's decree in Emack v. Kane (C. C.) 34 F. 46, and is uniformly subject to the condition that the defendant must be asserting what he knows to be false; he is allowed to press his rights and to threaten the trade, so long as he really believes his claims to be sound. Virtue v. Creamery Package Mfg. Co., 179 F. 113, 120 (C. C. A. 8); Oil Conservation Engineering Co. v. Brooks Engineering Co., 52 F.(2d)· 783 (C. C. A. 6). In the light of these decisions I agree that, just as before adjudication a putative infringer may stop a dishonest use of a patentee's claims, so an adjudicated infringer may suspend a decree against him, and perhaps vacate it, if the patentee deliberately misstate its scope and result. Short of that courts will not interfere in such disputes any more than in any other touting or puffing by merchants; they do not sit as censors upon the moderation, good taste, or even truthfulness of advertisements, trade circulars, or the like.

So the question here is merely whether the plaintiffs have used the decree with conscious knowledge that it did not go so far as they asserted. Except for the statements of their salesmen, of which more in a moment, I can find not even the proverbial scintilla of evidence to that effect. The language which Reilly, the defendants' president, put in Aronson's mouth, though Aronson himself gave another version, may perhaps be understood as threatening the defendants' business with extinction, but in that I can see nothing unlawful. A monopoly ex vi termini means a power to stop others' activity; it is not unlawful to use it ruthlessly, or to proclaim that you will press your advantage to the full, be the consequences what they may; it may not be desirable to give such powers to individuals at all, but I submit it is idle to give them and wince at their exercise. Certainly courts have no warrant for treating such a threat or its realization as unlawful, else they must themselves forbear the indiscriminate use of injunctions as a remedy for patent infringement. I know of no doctrine which requires, or indeed even permits, them so to temper the wind to the shorn lamb.

As to the wires and letters which the plaintiffs sent out to their salesmen and to the trade, they too seem to me blameless. They are challenged, as I understand it, for three reasons: First, they included "automatic" lighters generally; second, they covered combinations of the patented lighters with cigarette cases, trays and so on; third, they included lighters "of similar construction." The defendants had been making two styles of lighter which were called "Evans automatic" and "Evans roller-bearing"; we had enjoined both. Two other companies had been making "automatic" lighters, the "Golden Arrow" and the "Marathon"; the plaintiffs got consent decrees against each of these. The name "automatic" was used in the trade to distinguish a lighter in which the same mechanism moved at once the abrading wheel and the snuffer, from one in which the two were disconnected. I cannot find anything in the letters which the plaintiffs sent out, asserting directly or by implication that the decree covered all kinds of "automatic" lighters, assuming that there were upon the market others than those enjoined. The text of these documents is set out in the main opinion, and it hardly seems necessary to debate it in detail; if I construe it wrongly, that will appear by inspection.

The plaintiffs did try to stop the sales of "sets" and "combinations" containing .the lighters; they went further, they demanded and got statements from the books of some of the defendants' customers for an accounting for the sales of such sets. I can see nothing wrong in either. At times the lighter was incorporated into the top of a cigarette case.; at times the lighter, the case, a tray and other pieces of the same pattern were sold together. It was.entirely proper for the plaintiffs ,to stop the sale of any set of which the lighter was a piece, and it is not likely that the other pieces could be sold separately; but if they could, I can find no claim of a right to stop the sale of any pieces which did not contain

the lighter. As to the profits, they are notoriously difficult to estimate in patent accountings. How much in these cases they depended upon the lighter nobody could say in advance; some more or less arbitrary division was inevitable, and it was reasonable enough to start with finding out what had been the profits on the sets as a whole. Finally, although the decree did, and indeed could, cover only the lighters which were then before us, it validated the claims, and they were couched in general terms which we had read somewhat broadly. Perhaps we were wrong; in the decision we are handing down herewith, we have limited the word, "manual"—rightly in my judgment; but surely the plaintiffs were justified in supposing that they had won more than a Pyrrhic victory. This they expressed by saying that the decree covered lighters of "similar construction", and I cannot see why they should have said less. I agree that the phrase was vague, but so was the fact; nobody knew or could know how far the courts would extend the claims, but certainly there were *some* "similar constructions" that they would cover. Unless one reads any or all these statements with a jaundiced eye, I own I am unable to comprehend how we can spell out of them anything sinister; certainly they contained nothing which can justify the charge of a consciously dishonest use of the decree.

The salesmen probably did go further; it was inherently likely that they would, being a zealous folk, not sensitive, and perhaps not scrupulous, in the use of words. Some of the customers probably understood them to say that the plaintiffs could enjoin the sale of all "automatic" lighters; though how far they were justified in that understanding is not so clear. Some did not; they knew what the case had been about, and that the plaintiffs had prevailed over the Evans lighters and these alone. But I am not much concerned with what the salesmen did say, and arguendo I can accept the defendants' version on that. My brothers believe, since the plaintiffs were liable for their salesmen's torts, that their declarations, made within the scope of their authority, charged their employer's conscience and barred this suit. I do not; and that is really the only importance of our decision beyond the interests of the immediate parties. Whenever the question has come up, it has been held that immoral conduct to be relevant, must touch and taint the plaintiff personally; that the acts of his agents, though imputed to him legally, do not impugn his conscience vicariously. Vulcan Detinning Co. v. American Can Co.,

72 N. J. Eq. 387, 391, 392, 67 A. 339, 12 L. R. A. (N. S.) 102; Hedman Mfg. Co. v. Todd Protectograph Co., 265 F. 273, 278 (C. C. A. 7); Associated Press v. International News Service (D. C.) 240 F. 983, 989. Cf. Joseph Schlitz v. Houston Ice & Brewing Co., 241 F. 817, 824 (C. C. A. 5). On principle, so far as there is any principle about the whole matter, it seems to me that a plaintiff should not be so charged. The doctrine is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It has nothing to do with the rights or liabilities of the parties; indeed the defendant who invokes it need not be damaged, and the court may even raise it sua sponte. The reasons which justify imputing liability to a principal for his agent's acts, whatever they are, have nothing in common with such a notion. It would be monstrous that a man's conscience should bear the sins of those he employs, however liable he may be for their acts, and a doctrine which stands upon moral wrongdoing must clear itself of that confusion, or adopt another form. While it stands upon the court's repugnance to the suitor personally, it must confine itself to his personal delinquencies.

A last argument is this. The plaintiffs upon the trial of this suit had argued, and put on an expert witness to swear, that the phrase, "manual pressure," in the claims presupposed a direct connection between the smoker's thumb and the abrading wheel and snuffer; and they distinguished some of the prior art for this reason. Availing themselves of this, the defendants got out a new lighter, the "Trig-a-lite," with a spring interposed, which we are to-day saying escapes the claims (70 F.(2d) 639). The plaintiffs told the trade that this new lighter fell within our decision in the case at bar, and upon the trial of the "Trig-a-lite" suit they took the position that the interposed spring made no difference. It is now argued that this use of the decree in the trade, and this position taken in the "Trig-a-lite" suit, were so inconsistent with what had gone before as to be dishonest, and so dishonest as to destroy this decree. But there is not the least reason to suppose that what the plaintiffs told the trade, they had any doubt that they could make good. Besides they advised their correspondents that it was their lawyers' opinion on which they relied and they sent along a copy of our opinion to back it up. It was the claims that we had there held valid, not

the reasoning of the expert, and whether we would hold that "manual pressure" precluded any interposed spring could be known only after it had been tried out. The appeal was itself an evidence of good faith, was prosecuted with every evidence of conviction, and undoubtedly represented the honest belief of the plaintiffs and their counsel. Indeed the result we have reached was by no means inevitable, given the correctness of all we had said before. Even a superficial acquaintance with the uncertainties of patent litigation provides one with tolerance for more glaring changes of position. That part of the argument which goes to the conduct of the "Trig-a-lite" suit itself, has even less basis. The plaintiffs put forward their new interpretation in open court before a judge, in the presence of an opponent who had access to all that had gone before, and who at once perceived, and made use of the inconsistency. The chances for any overreaching were fanciful; the moral standard, which should visit upon a patentee forfeiture of the suit for such a lapse, if it be a lapse at all, is beyond my knowledge. In general I think that the plaintiffs, throughout their "campaign," kept within permissible limits of conduct; and while such relentless competition is not indeed an edifying spectacle, neither side appears in the record as freshly come from Arcady.