**MORNY v. WESTERN UNION TELE-
GRAPH CO. et al.**

District Court, S. D. New York.

Aug. 8, 1940.

Abraham M. Lowenthal and Stanley Os-
serman, both of New York City, for plain-
tiff.

Francis R. Stark and R. H. Overbaugh,
both of New York City (Ralph Kimball
and John H. Waters, both of New York
City, of counsel), for defendants Western
Union Telegraph Co. and Roy B. White.

Hunt, Hill & Betts, of New York City
(Harold R. Medina, of New York City,
of counsel), for Trans-Lux Corp., P. N.
Furber, and Trans-Lux Movie Ticker
Corp.

Edward L. Blackman and Walton Clark,
Jr., both of New York City (Harold R. Me-
dina, of New York City, of counsel), for
News Projection Corp., James W. Deck-
er and F. Huntington Clark.

Briesen & Schrenk, of New York City
(Hans V. Briesen and Henry C. Quigley,
Jr., both of New York City, of counsel),
for defendant Gustave Drews.

COXE, District Judge.

This is an action for treble damages un-
der the Sherman and Clayton Anti-Trust
Acts, 15 U.S.C.A. §§ 1, 2 and 15. The
case was tried before the court without
a jury.

The defendants, Trans-Lux Daylight
Picture Screen Corporation (hereinafter

referred to as "Trans-Lux"), and News Projection Corporation (hereinafter referred to as "News Projection"), were for a number of years, commencing in 1925, competitors in the business of manufacturing and leasing stock quotation projection machines; between them they controlled practically all of the available business in such machines in the United States. The purpose of these machines is to project the printed quotations from the ticker tape on to a screen where they can be seen by a large number of persons at one time.

The machines are used principally in connection with tickers carrying the stock quotations originating on the New York Stock Exchange. These tickers are operated only by New York Quotation Company, a wholly owned subsidiary of the New York Stock Exchange, in the Borough of Manhattan, south of Chambers Street; they are operated exclusively by Western Union Telegraph Company (hereinafter referred to as "Western Union") in all other territory in the United States.

Both Trans-Lux and News Projection held patents on different features of their respective machines. The most important of these was the Proctor patent, No. 1,-299,024, owned by News Projection, covering a device for controlling the tension on the ticker tape as it passed into the projector. Western Union likewise held a Dirkes patent, No. 1,684,309, protecting a number of special features in a projection machine which it had developed but had not placed in general use.

During the period from 1925 to 1931, Trans-Lux and News Projection were in almost continuous patent litigation with each other over their respective machines. There was also an infringement suit by Western Union against News Projection based on the Dirkes patent No. 1,684,309. Among the suits commenced by News Projection was one brought in this district in 1925 against Trans-Lux for alleged infringement of the Proctor patent No. 1,299,024. This suit was tried at final hearing before Judge Thacher, and resulted in a decree holding Claim 3 of the patent valid and infringed, and directing the issuance of an injunction against Trans-Lux. On appeal to the Circuit Court of Appeals for this Circuit, the decree of the District Court was unanimously affirmed. News Projection Corp. v. Trans-Lux Daylight Picture S. Corp., 2 Cir., 25 F.2d 633.

This decision of the Circuit Court of Appeals did not however end the litigation over the Proctor patent No. 1,299,024, for Trans-Lux immediately modified its machine in an effort to escape from the injunction. News Projection thereupon obtained permission to file a supplemental complaint directed against the modified structure. Soon afterwards, Trans-Lux made application for leave to reopen the entire case on the ground of newly discovered evidence. This application was first referred to a master solely for the purpose of taking testimony; subsequently, after considerable testimony had been taken, it was brought on for hearing before Judge Mack in the early part of 1931.

It was at this stage of the proceedings that one of the attorneys for News Projection brought up the question of a possible settlement. This led to discussions between the parties, and, after negotiations over a protracted period, an agreement of settlement was finally reached on April 21, 1931. It is this agreement as amplified by a supplemental agreement entered into on July 17, 1931, upon which the plaintiff places his main reliance in the present action.

It is unnecessary to summarize the agreement in any detail; it will be sufficient for the present purpose merely to say that it provides (1) for the discontinuance of all pending litigation between Trans-Lux and News Projection; (2) for the organization of a new corporation called Trans-Lux Movie Ticker Corporation (hereinafter referred to as "Movie Ticker") to take over the entire stock ticker projector business of both corporations; (3) for granting exclusive licenses for such business to the new corporation under all patents held by Trans-Lux and News Projection; and (4) for the division of the entire stock of the new corporation between Trans-Lux and News Projection in specified proportions.

No sooner had the agreement been signed than disputes arose, which later developed into further bitterly contested litigation over the succeeding three years. These disputes were first submitted to arbitrators for determination, and were the subject of long drawn out hearings, at which a large amount of testimony was taken. During the course of the proceedings, two awards were made, both of which were opposed in the State courts by News Projection. The last award was

made on January 29, 1934, and directed that the 1931 agreement be consummated. This award was confirmed by the New York Supreme Court on April 9, 1934, over the objection of News Projection, and the order of confirmation was unanimously affirmed by the Appellate Division on June 21, 1934. News Projection Corp. v. Trans-Lux Daylight Picture Screen Corp., 242 App.Div. 630, 271 N.Y.S. 1098.

In the meantime, News Projection had carried its opposition to the settlement to Delaware, where a suit was brought in the Federal Court to restrain Trans-Lux from enforcing the award of the arbitrators on the ground that the agreement was induced by fraud. In this suit, News Projection applied for a temporary injunction in the fall of 1934, and it was only after the application had been denied, on December 19, 1934, that further opposition by News Projection was abandoned.

I have made this somewhat detailed recitation of the facts surrounding the 1931 agreement not only to show the background for the settlement, but also because I think it indicates that there was no collusive adjudication of the patents by Trans-Lux and News Projection. The remaining facts more intimately concern the plaintiff Morny, and his efforts to introduce a competing machine.

Morny joined News Projection in 1927, and was placed in general charge of sales; he had previously been connected with the defendant Decker, president of News Projection, in various business enterprises. News Projection had been in existence since 1925, and had five or six machines under lease at the time Morny became connected with the company. The arrangement with Morny was at first on a commission basis, but on May 24, 1928, he was given a contract, under which he was to receive a rising salary dependent on the number of machines under lease. Under this contract, he was paid $10,000 a year for a number of years prior to 1935.

The decision of Judge Thacher holding Claim 3 of the Proctor patent valid and infringed came down on Dec. 14, 1927, and was affirmed by the Circuit Court of Appeals on April 9, 1928. These two decisions very considerably stimulated the business of News Projection, so that by June 30, 1930, the number of machines under lease had risen to 705. The number of machines under lease by Trans-Lux as of the same date was 1771.

Movie Ticker was organized in Delaware in 1931, but aside from keeping alive its corporate existence it remained practically dormant until after the consummation of the merger on January 1, 1935. Morny was elected a director on July 12, 1934. He testified, however, that he had no knowledge of his election until he was so advised by Decker on December 23, 1934.

Morny testified that on numerous occasions after the signing of the settlement agreement in 1931, he was told by Decker that it was doubtful whether he would have a place in the new corporation owing to the hostility of the defendant Furber, president of Trans-Lux. He testified further that on December 23, 1934, Decker came to his office, and, after advising him that he had been elected a director of Movie Ticker, expressed his regret that Morny "was not to be connected with the new company". He said that he told Decker that in that event he would do whatever was necessary to protect his own interests. Decker denied that any such conversation took place on December 23, 1934. He did say, however, that at about this time he told Morny that no matter what happened he could still remain with News Projection at the same salary he was then receiving. Decker insisted that this was entirely practicable inasmuch as News Projection was only turning over part of its business to Movie Ticker.

Morny attended the meeting of the directors of Movie Ticker on December 24, 1934, and voted with the other directors in favor of various resolutions effectuating the merger. At this meeting, Furber was elected chairman of the Board, and Decker was elected president. On the same day, Morny arranged with his half-brother, Witherspoon, "to develop" a competing projector. Witherspoon had been an editor for technical journals, and had had some experience in designing an art projector, which News Projection undertook in 1933 to exploit on a royalty basis; he also had seen the stock quotation projector of News Projection at different places; and he professed to have some knowledge of the Proctor and Dirkes patents, Nos. 1,299,024 and 1,684,309.

During the few days following December 23, 1934, Morny prepared, at the request of Decker, a draft letter to be sent to the salesmen and service representatives, explaining the nature of the merger, the officers and directors, and what the men

might look forward to in so far as future employment was concerned. This draft was discussed with Decker, and the letter was mailed on December 31, 1934, to eight employees of News Projection (including Franklin, Peck and Alston), all of whom had worked under Morny in the sales department. The letter stated that Morny's "own status in connection with the operating end of the business is, as yet, undetermined and will probably remain in a most anomalous position for some time to come, except insofar as I will be engaged in the work of assisting in perfecting the consolidation of the business". It also advised the different employees that it "seems likely that some members of our organization will find it necessary to make other connections", and warned them that if an opportunity presented itself they should "take advantage of it".

In the early part of January, 1935, Morny secretly rented an office at 25 Beaver Street, New York City, which he used as the headquarters for his new activities. He also discussed with Clyde D. Knapp, an investment broker, the question of raising funds to finance his operations. He continued, however, with Movie Ticker, at a salary of $200 a week, after the corporation commenced actively to function on January 1, 1935.

On January 9, 1935, Morny wrote Franklin, district manager at Chicago, on the letterhead of News Projection, advising that the policy of the new corporation would be to close the district offices and eliminate the district managers. The letter further stated that the district managers would be "let out after about three months from January 1st", and suggested that Franklin "should make some effort to locate" himself elsewhere. There was attached a rough memorandum in Morny's handwriting, also dated January 9, 1935, marked "Strictly confidential. Please destroy at once", reading, "You will receive a letter from me on plain paper telling you of plans I have made and if you are willing to go along with me write by return air mail to the address I specify in the letter".

This same letter, with a similar memorandum in Morny's handwriting attached, was apparently also sent to Alston, district manager at Detroit.

The letters to Franklin and Alston, referred to in the above "strictly confidential" memorandum, are substantially identical in phraseology, both dated January 9, 1935, and both signed by Morny. In these letters, Morny stated that he was forming his own projector company, "which will be called the Brokers Ticker Screen Corporation", and that he has "had a method of operating developed, which is "a complete evasion of all patents, and which furnishes a projector with at least one substantial advantage over either News Projection or Trans-Lux". The letters further stated that Movie Ticker "will restore" certain rates "within a very short time and probably in the early spring advance the base rate from $50 to $60 and this will make the brokers very angry and open the door to us on a large scale". There was a general outline of the rates Morny proposed to charge for his new machine, and it was stated that he was "planning to build 250 machines at once, and have them distributed and held in storage ready for the start of operations", and was "raising a substantial amount of capital". The letters concluded with a request for an answer as to whether "each man was willing to go along with me or not".

At the time these letters were written Morny was engaged in making an examination of the entire rate schedule of Movie Ticker for Decker; he subsequently prepared written memoranda on the subject recommending that certain of the rates be substantially increased. He was also cooperating with Witherspoon in designing and building a working model of his proposed new machine.

Witherspoon testified that the drawings for this machine were delivered to J. H. Bunnell & Company, a machine manufacturer in Brooklyn, on January 2, 1935, and his diary shows that the completed projector was taken to the office at 25 Beaver Street on February 8, 1935. In a letter written by Morny to Alston on February 8, 1935, he states: "We are moving the completed projector into the temporary office tonight", and, further, "I do not want to shoot until non-maintenance rates are raised to $75 by which time we will have 250 machines on hand".

Morny testified that in the early part of January, 1935, he first talked with Wilson and Talbot, two of the salesmen, regarding his plans to go into business, and they expressed a desire to join him; the group was soon afterwards enlarged to include Franklin, Peck and Alston. These men were all at the time on the pay roll of Movie Tick-

er, and Morny, as late as February 28, 1935, wrote Franklin, Alston and Peck that he was particularly anxious "to keep every man on the payroll as long as possible so as to reduce the strain on our initial capital".

Decker testified that the first knowledge he had that Morny was engaged in outside activities was on February 11, 1935, when Wilson told him that Morny had taken an office at 25 Beaver Street, where he was developing a projector and planning to go into a competing business. Decker further testified that he asked Wilson to continue his relations with Morny and keep him advised of any developments; he also engaged a detective to find out what Morny was doing, in an effort to corroborate what Wilson had told him.

Through this connection with Wilson, it was possible for Movie Ticker to obtain access to the Morny office at 25 Beaver Street on two occasions, namely, on March 25, and April 20, 1935, for the purpose of inspecting the Morny machine. On the first of these occasions, Drews, a patent attorney formerly employed by News Projection, and one of the defendants in the present action, went to the office, at Decker's request, accompanied by a draftsman; he was admitted by Wilson, but did not find any machine, and came away without accomplishing anything. On the second occasion, Drews went to the office alone, and, finding the outer door unlocked, walked inside, where he met Wilson; there was then in the office a completed projection machine, which Drews inspected, but he did not feel that the inspection gave him sufficient information upon which to base an infringement suit.

On April 25, 1935, Decker called Morny into his office, and told him that he had knowledge of the office at 25 Beaver Street, and of Morny's activities in developing a competing machine. There was then a long and acrimonious conversation, during which Decker charged Morny with disloyalty, and Morny retorted, "I haven't any desire to go in the business. I haven't any intention of going in the business. I don't want to go in the business. I am all worn out and tired from fighting your battles, and whether I go in this business or not is entirely up to you. The problem is right in your lap for you to decide". Decker replied that in view of what had occurred, he could not recommend Morny for employment by Movie Ticker, and suggested that he go to a ranch in Montana and stay there for a rea-

sonable time, in which event Decker would personally continue his salary. This suggestion was refused by Morny, and on the following day, namely, April 26, 1935, he was discharged.

During the period from January 1, 1935, to April 26, 1935, Morny attended six separate meetings of the directors of Movie Ticker, and voted on various resolutions connected with the merger. He admitted that every vote he cast at these six meetings, as well as at the meeting on December 24, 1934, "was an act which assisted in the confirmation of this merger". Morny in his testimony sought to create the impression that he was acting as a director entirely under orders from Decker. It can hardly be doubted, however, that he acted with full knowledge of the facts and a complete understanding of the reasons for and purpose of the merger.

After the working model of the Morny machine had been completed by J. H. Bunnell & Company, Morny proceeded to have additional machines built by Stolp Wire Works in Brooklyn. The first actual machine produced was the Bunnell model, which was converted so as to make it available for commercial use. This machine was sent to Franklin, Morny's representative in Chicago, just prior to May 30, 1935. The second machine produced was largely the work of Stolp Wire Works, and was sent on trial to Fenner & Beane, stockbrokers in New York, in the latter part of July, 1935.

The first machine was inspected, with Morny's consent, by Presson, a patent attorney in the legal department of Western Union, and by other representatives of that company, in Chicago on June 5, 1935, when a drawing of the mechanism was made by Burkhardt, a draftsman employed for the purpose. Presson was of the opinion that the machine infringed various claims of the Dirkes patent No. 1,684,309. A copy of the Burkhardt drawing was obtained by Drews, patent attorney for Movie Ticker, who was at the time in Chicago, and he was of the opinion that the machine also infringed five of the Proctor patents. Upon his return to New York, Drews conferred with Von Briesen, patent counsel for Movie Ticker, and he concurred in Drews' opinion regarding infringement.

On June 20, 1935, Movie Ticker and News Projection brought suit in this district against Morny, Morny's wife and Witherspoon for alleged infringement of the basic Proctor patent, No. 1,299,024, and four oth-

er Proctor patents, as well as for unfair competition. In this suit, the cause of action for unfair competition was later stricken out on motion of the defendants on purely jurisdictional grounds. Then in the early part of July, 1935, another suit was commenced in the Eastern District of New York by Movie Ticker and News Projection against Jeanette M. Stolp, individually, and doing business as Stolp Wire Works and under other similar names, for alleged infringement of the same five Proctor patents. Von Briesen explained that this latter suit was brought in the Eastern District of New York because an early trial could readily be obtained there. Holland, attorney for Morny, represented the defendants in both suits. In the Stolp suit, the defendant made sworn answers to interrogatories propounded by the plaintiffs to the effect that the Stolp Wire Works had nothing whatever to do with the Morny machine. Von Briesen testified that in view of these sworn answers he was in no position to proceed with the case, and in 1937 the suit was dismissed for lack of prosecution.

When Presson, patent attorney of Western Union, returned from his inspection of the Morny machine in Chicago, he conferred with Reynolds, the head of the legal department of the Western Union dealing with patents, and both men were in agreement that the machine infringed the Dirkes patent. Morny was advised to this effect by letter, dated July 18, 1935, which was delivered to him personally on July 24, 1935.

In the meantime, the second Morny machine, which was substantially identical with the Chicago machine, had been installed in the Fenner & Beane office, in New York; it was inspected there on July 25, 1935, by Reynolds and Presson, acting for Western Union, and by some representatives of Movie Ticker. This inspection only confirmed the opinion previously reached by Reynolds and Presson of Western Union with respect to infringement. Western Union accordingly brought suit against Morny in this district on July 26, 1935 for alleged infringement of the Dirkes patent.

On August 7, 1935, an incident occurred at the office of Fenner & Beane, from which the plaintiff seeks to draw an inference that the machine there was tampered with by the defendants. Morny testified that in the late afternoon of August 6, 1935, he

was on his way to the Fenner & Beane office when he met Presson of Western Union and Drews and Clark of Movie Ticker as they were leaving the building in which the Fenner & Beane office was located. He further testified that Russell, a partner of Fenner & Beane, told him when he reached the Fenner & Beane office that Presson, Drews and Clark had been there with a request for permission to open and examine the machine, which he had refused. He also said that he saw the machine that night at the Fenner & Beane office, and that it was then "in perfect operating condition".

On August 7, 1935, Talbot, one of the men associated with Morny, went to the Fenner & Beane office at about 9:30 A. M., and found the glass in the door leading from the main hall to the room where the machine was installed broken, and the machine partly disassembled. Russell, of the Fenner & Beane firm, who himself saw the condition of the machine, immediately advised Clark of Movie Ticker, and was authorized by him to employ private detectives, at the expense of Movie Ticker, to investigate the whole affair.

It was shown by the defendants at the trial that in the early morning of August 7, 1935, the glass in the door of the Fenner & Beane office was accidentally broken by Donnelly and Tolley, two of the night porters employed in the building, while they were engaged in cleaning the office. There was also positive testimony by Presson and Drews that the only time they were at the Fenner & Beane office was on July 25, 1935, when they inspected the Morny machine. Moreover, Russell, who was called as a witness by Morny, had no recollection whatever that Presson, Drews or Clark were at the Fenner & Beane office on August 6, 1935, as asserted by Morny. Finally, Witherspoon made the following entry in his diary under date of August 6, 1935, regarding the operation of the Fenner & Beane machine: "Feel discouraged over this machine—something always going wrong owing to rotten way it's put together—Bearings are far from true, which causes noise, and continual pounding loosens pulleys—which are not fastened with pins as we instructed Mac but with set screws—Idler is cock-eyed—Parts not interchangeable".

In the light of this testimony, I am satisfied that none of the defendants was in any way involved in or responsible for what

happened to the machine at the Fenner & Beane office on August 7, 1935.

During the summer and fall of 1935, Morny attempted to install machines in various brokers' offices, but met with little success. He said that he had verbal orders for a considerable number of machines, but it is clear that there were only a few machines available for installation, and even those were still in the development stage. I do not doubt, either, that the infringement suits seriously interfered with installations. The pendency of these suits was known to the brokerage offices, and as early as July 5, 1935, notices were sent by Movie Ticker to some brokers with whom Morny was negotiating, advising them that suits of that nature had already been commenced.

One of these notices was sent to Fenner & Beane on July 5, 1935, yet Fenner & Beane tried out the Morny machine for "a day or two" thereafter, and the machine was not removed until after the incident on August 7, 1935. A machine was also installed in the New York office of Burton, Cluett & Dana, where it remained for some months. This firm was sued by Movie Ticker and News Projection on September 13, 1935, for infringement, after which the machine was returned to Morny, and the suit was discontinued. Morny said that he placed another machine in one of the New York offices of Orvis Brothers, but that the machine was returned after Orvis Brothers had received a notice from Movie Ticker advising them of the pendency of the infringement suits.

In the fall of 1935, Witherspoon and Morny made a number of changes in the design of the original machine and arrangements were made for the manufacture of a second type of machine at the Mountford plant in New Jersey. Later, a dispute arose over the financing of the Mountford operations, and on February 1, 1936, further work on the machines was transferred to J. H. Bunnell & Company in Brooklyn. At the time of the transfer, there were eleven partially completed machines in the Mountford plant.

In the meantime, Morny organized in New York, in October 1935, a small corporation called "Brokers Ticker Screen Corporation", but it is doubtful whether the corporation ever really functioned; and on October 28, 1935, Witherspoon filed application for a patent on the first type of machine, containing a large number of claims. All of these claims were subsequently finally rejected by the patent office.

The second type of machine was completed about February 1936, and a few machines were available for use in the spring of that year. The same difficulties which Morny had encountered with the first type were present also with this one. There were various inspections by representatives of Western Union and New York Quotation Company, but these always left the question of infringement unsolved.

On November 2, 1936, Movie Ticker and News Projection filed a petition in the first suit commenced in this district against Morny, Morny's wife and Witherspoon for leave to file a supplemental complaint directed against the second type of machine. This petition was opposed by Morny, and was denied without prejudice to the commencement of separate suits. Immediately thereafter, Movie Ticker and News Projection started two suits in this district against Morny and Brokers Ticker Screen Corporation, each for alleged infringement of different patents owned by the two companies.

In 1936, Morny was able to place his second type of machine on trial with a few brokerage houses. One of these machines was installed in the office of Libaire & Company in New York in the fall of that year. Soon afterwards, Libaire & Company were notified of the pending suits against Morny. This was followed on November 18, 1936, by the commencement of an infringement suit by Movie Ticker and News Projection against the Libaire firm, after which the machine was removed, and the suit was discontinued.

The three main infringement suits brought by Movie Ticker and News Projection in this district appeared on the calendar for trial just before the summer recess in 1937, and it was expected that they would be reached for trial in the fall of that year. During the summer months Von Briesen and Drews, representing the plaintiffs in the suits, were actively engaged in preparation for trial, and spent considerable time with Mr. Dyer, a well-known patent expert, who was to be called as a witness at the trial. As the time for trial approached, Von Briesen made inquiry regarding the commercial situation with respect to the Morny machine, and found that the machine had disappeared from the market. He, there-

fore, believed that no useful purpose would be served by a trial of the suits, and advised his clients accordingly. An application was subsequently made for leave to discontinue, which was granted over the opposition of Holland, Morny's attorney, and on October 4, 1937, an order was signed discontinuing all three suits without prejudice. Western Union had previously asked for permission to discontinue its suit against Morny for similar reasons, and an order dismissing that suit had been signed on May 13, 1937.

During the entire period of over two years that Morny was engaged in attempting to develop his projection machine, he was in constant difficulty in financing his operations. He had little if any capital of his own on December 24, 1934, when he first asked his half-brother, Witherspoon, to assist him in his work. During the period ending with his discharge on April 26, 1935, he was receiving a salary from Movie Ticker of $200 a week, and this, with chance loans from friends, was about all he had for the business. After April 26, 1935, he again sought the assistance of Clyde D. Knapp, in an effort to obtain financial backing, but Knapp's activities did not extend beyond approaching Goodbody & Company, a brokerage firm in New York, and they showed no interest. He also turned to John H. Carpenter, a friend with whom he had been formerly associated, and Carpenter made him a number of small personal loans, commencing on June 27, 1935, which amounted in the aggregate to $1,050. In May, 1935, he sought to interest Alpheus Beane of Fenner & Beane, but his negotiations there never passed beyond a preliminary stage; this lack of interest may have been due in part to a visit which Furber paid to Vivien, a partner of the Fenner & Beane firm, although there is no evidence that Beane was otherwise prepared to furnish any financial support.

It is charged in the complaint that the defendants threatened Paper Manufacturers Co., Inc., a large paper manufacturer in Philadelphia, with loss of business if it supplied Morny with glassine ticker tape for his projection machines. Glassine ticker tape is a special product used only for projection work, and Trans-Lux and News Projection had for a number of years obtained their requirements of the material from Paper Manufacturers Co., Inc. This company made two types of the tape, one specially developed for Trans-Lux and "confined" to it, and the other a general product sold principally to News Projection.

Morny testified that "in the summer or spring of 1935" he asked Coar, secretary of Paper Manufacturers Co., Inc., to sell him glassine ticker tape, and that Coar refused to do so on the ground that "Decker told him that if he sold tape to me, he would lose the Trans-Lux business". Coar denied that he ever had any such conversation either with Morny or with Decker, or that he had ever refused to sell Morny glassine ticker tape. He produced in support of his testimony two invoices covering two different sales of "3/4 inch glassine tape" to Brokers Ticker Screen Corporation on June 28, 1935. According to Coar, these were the only orders ever received by him or his company from Morny or Brokers Ticker Screen Corporation.

There is nothing in the letter written by Coar to Tickerscope Company under date of April 16, 1936, to cast doubt on Coar's credibility. In this letter, Coar stated "our arrangement with the Trans-Lux Co. is that we should not sell their paper to any other user of this product". As explained by Coar, this had reference to the "confined" paper developed for Trans-Lux, a small quantity of which had been sent to Tickerscope Company by mistake; it was the recognized custom of the trade not to sell such paper to other concerns. On all the evidence relating to this part of the case, I find that no threats were made by the defendants, such as charged in the complaint.

It will be seen from the above summary of the evidence that the case breaks up into two separate and distinct parts, one covering the period ending with the consummation of the merger, and the other having to do with the efforts of the defendants after the merger to prevent Morny from producing and installing his projection machines. Morny contends that the activities of the defendants in both of these periods injured him in his "business or property". 15 U.S.C.A. § 15.

It is not necessary to decide whether or not the merger was incident to an attempt to monopolize or to a conspiracy in restraint of trade. Even if it was, I still do not think that Morny is in a position to complain, for he actively participated in the different steps which

brought the merger into existence. Eastman Kodak Co. v. Blackmore, 2 Cir., 277 F. 694; Bluefields S. S. Co. v. United Fruit Co., 3 Cir., 243 F. 1. He was a director of Movie Ticker, and, during the period from December 23, 1934 until his discharge on April 26, 1935, he attended seven separate board meetings, at which he voted in favor of various resolutions to effectuate the merger. He himself admitted that every one of these votes "was an act which assisted in the confirmation of this merger". He also prepared statements of policy for the guidance of Decker, which not only treated the merger as an accomplished fact, but contained suggestions for carrying out the combined operations of the constituent companies. I think, therefore, that if there was any conspiracy Morny was a party to it.

It remains to consider whether there can be any recovery for any of the acts of the defendants subsequent to the merger. A number of these acts occurred during the period from January 1, 1935 to April 26, 1935; others, during the subsequent period. Some have already been considered in the foregoing summary of the evidence, and as to these no further comment is required. The remainder concern principally the infringment suits involving the Morny machines, and the notices sent to the prospective customers advising them that such suits had been commenced.

■ I do not think it can be seriously questioned that Morny was guilty of extreme disloyalty in secretly planning to produce a competing projection machine while still in the employ of News Projection and Movie Ticker. The excuse he gave was that he had been advised by Decker that he "was not to be connected with the new company". Yet all of his actions prior to his discharge on April 26, 1935, seem to have been with the idea that he could ultimately force Movie Ticker to employ him on his own terms. He admitted as much when he testified that he told Decker on April 25, 1935, that he "hadn't any intention of going in the business", and "whether I go in this business or not is entirely for you to decide". In his later testimony, he referred to his new business as an "insurance proposition".

It is no small wonder, therefore, that Decker felt, when he was told by Wilson on February 11, 1935 that Morny was engaged in developing a projection machine of his own, that Morny should be watched. Morny knew that Wilson was in the employ of Movie Ticker, but he did not foresee that Wilson might have a twinge of conscience and tell Decker of his dealings with Morny. Through the Wilson connection, Decker was able to obtain an inspection of the Morny machine at 25 Beaver Street.

Morny insists that this charge of disloyalty is not open to the defendants in the present action. He refers in support of his contention to a suit which he brought in the State Court in 1936 against Movie Ticker and News Projection for $13,000 for back salary under the agreement of May 24, 1928. In this suit, Movie Ticker and News Projection filed separate answers, in which each set up a counterclaim charging Morny with disloyalty. The suit was settled in 1938 by the payment to Morny of $5,500, and releases were thereupon exchanged. There was no trial or adjudication of any of the issues, and I find nothing in the cases cited by the plaintiff to support the contention that the defendants are estopped in the present action to raise the question of disloyalty against Morny.

This brings me to the infringement suits. There were six of such suits commenced by Movie Ticker and News Projection, of which five were brought in this district and one in the Eastern District. The first suit in this district concerned the first Morny machine; later, when the second type of machine appeared, two additional suits were started in order to bring that machine into the litigation. There was also a suit in this district against Burton, Cluett & Dana relating to the first machine, and a further suit, also in this district, against Libaire & Company involving the second type of machine. The Stolp suit in the Eastern District was directed against the first machine, and was brought there in order to obtain an early trial. In addition to these six suits commenced by Movie Ticker and News Projection, there was one suit in this district by Western Union for alleged infringement of the Dirkes patent.

■ Were these suits brought in good faith, and in the honest belief that the Morny machines infringed? That is the test usually applied in cases of this kind

where patent rights are involved; it is just as applicable to warning notices as it is to the suits themselves. Virtue v. Creamery Package Co., 8 Cir., 179 F. 115, affirmed 227 U.S. 8, 33 S.Ct. 202, 57 L.Ed. 393; Kellogg Co. v. National Biscuit Co., 2 Cir., 71 F.2d 662; Alliance Securities Co. v. De Vilbiss, 6 Cir., 41 F.2d 668.

■ Among the patents which were the subjects of the first suits commenced by Movie Ticker and News Projection was the basic Proctor patent No. 1,299,024, Claim 3 of which had been held valid and infringed by the Circuit Court of Appeals in News Projection Corp. v. Trans-Lux Daylight Picture S. Corp., 2 Cir., 25 F.2d 633. It cannot be doubted, therefore, that at least as to that patent, there was strong ground for believing that the suits had substantial merit. The four other Proctor patents involved in the suits covered different features of the machine, and counsel considered them of sufficient importance to include them in the suits. The Dirkes patent, No. 1,684,309, which was the subject of the Western Union suit, was also an important patent with numerous claims covering various features of the Western Union machine.

None of these first suits was brought hastily but only after inspection of the first Morny machine, and a full examination of the prior art. Von Briesen and Drews, who were patent counsel for Movie Ticker and News Projection, testified that they were firmly of the opinion that all five Proctor patents were infringed. Reynolds and Presson, patent counsel for Western Union, gave similar testimony with respect to the Dirkes patent.

There is nothing in the evidence to indicate that Morny's first machine avoided infringement of the Proctor and Dirkes patents. Witherspoon, who designed the machine, had only a superficial knowledge of the ticker projection art, yet he says he was able to complete his drawings for the machine and place them in the hands of J. H. Bunnell & Company on January 2, 1935, or barely a week after he had been commissioned by Morny to design the machine. Morny, in his "strictly confidential" letters to Franklin and Alston, dated January 9, 1935, speaks of the machine as a "complete evasion of the patents". Moreover, when Witherspoon applied for a patent on the machine in the

fall of 1935, all of the claims were rejected by the patent office.

The two suits commenced in 1936 by Movie Ticker and News Projection against Morny and Brokers Ticker Screen Corporation were in reality merely extensions of the first suit against Morny, Morny's wife and Witherspoon. They were brought on the advice of Von Briesen and Drews, patent counsel for Movie Ticker and News Projection, who were of the opinion that Morny's second type of machine also infringed various other patents owned by the two companies.

I do not think that the voluntary discontinuances obtained in 1937 indicated any lack of faith in the merits of the suits. When the litigation first started, Movie Ticker and News Projection were anxious for an early trial. They brought the Stolp suit in the Eastern District because the calendar there was less clogged than it was here. But the Stolp suit was completely frustrated when Holland, Morny's attorney, allowed Jeanette Stolp, the defendant in the suit, to make sworn answers to interrogatories, in which she denied having had anything to do with the Morny machine.

The litigation in this district then became complicated with procedural difficulties resulting from changes in the Morny machine, and it was not until just before the summer recess in 1937 that the cases appeared on the calendar for trial. They were not, however, reached at that time, and Von Briesen and Drews spent a considerable part of the summer in preparation for the trial, which was expected to take place in the fall. It was later discovered that the Morny machine had disappeared from the market, and in October of 1937 the order of discontinuance covering all three suits was signed. I can find nothing in this record to show that Movie Ticker and News Projection were seeking to avoid an adjudication; it suggests rather that Morny himself was trying in every way possible to delay the cases because of the insecurity of his position.

I hold, therefore, that all of the suits commenced by Movie Ticker, News Projection and Western Union were brought in good faith, and that the various notices sent to prospective users of the Morny machines were entirely justified. With this disposition, I think I have passed on

all the principal charges made against the defendants, and it will not be necessary to consider the evidence relating to the damages.

There may be a judgment in favor of all of the defendants dismissing the complaint on the merits, with costs.