## GEROSA et al. v. APCO MFG. CO.

(Circuit Court of Appeals, First Circuit. May 28, 1924.)

No. 1685.

1. **Patents ⊂⇒328—1,263,879, for lug for power plant support for motor vehicles, held void for lack of invention.**

   The Gerosa patent, No. 1,263,879, for lug for power plant support for motor vehicles, in combination with others elements, which were old, particularly adapted to repair of Ford automobiles, *held*, void for lack of invention, as involving nothing more than mechanical skill.

2. **Injunction ⊂⇒12—Granted only to protect from future injuries.**

   Equitable relief by injunction cannot be afforded for past injuries, but only for prevention of further injuries.

3. **Trade-marks and trade-names and unfair competition ⊂⇒68—Essence of "unfair competition" is deception.**

   The essence of the wrong in "unfair competition" consists in the sale of the goods of one manufacturer or vendor for those of another.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

4. **Patents ⊂⇒283(1)—A patentee, who makes unwarranted use of the name of the courts to prejudice of competitors, comes into court with unclean hands.**

   A patentee, who uses the name of the courts in advance of adjudication to harass or obstruct competitors, does not come into court with clean hands.

5. **Patents ⊂⇒294—Defendant held entitled to injunction against unwarranted advertising by complainant.**

   A defendant *held* entitled to an injunction against complainant, which as owner of a patent obtained consent decrees against customers of defendant, which it advertised by circulars to the trade in such way as to, convey the false impression that its patent had been sustained as against defendant's structure.

   Appeal from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

   Suit in equity by Anthony Gerosa and the Hudson Motor Specialties Company against the Apco Manufacturing Company. Decree for defendant, and granting defendant injunctive relief, and complainants. appeal. Affirmed.

   For opinion below, see 288 Fed. 871.

   Melville Church, of Washington, D. C. (J. King Harness, of Detroit, Mich., and Alfred H. Hildreth, of Boston, Mass., on the brief), for appellants.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Wallace R. Lane, of Chicago, Ill., and Chauncey E. Wheeler, of Providence, R. I. (Arthur M. Allen, of Providence, R. I., and George Mankle, of Chicago, Ill., on the brief), for appellee.

Before BINGHAM and JOHNSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge.    This case comes before the court upon appeal from a decree of the United States District Court in the Rhode Island District, dismissing plaintiffs' bill, which charged:

(1) Infringement of letters patent No. 1,263,879, Anthony Gerosa, lug for power plant support for motor vehicles, granted April 23, 1918, on application filed May 9, 1917.

(2) Infringement of an alleged trade-mark on the descriptive phrase "Crank Case Repair Arm."

(3) Unfair competition by defendant's manufacture and sale of its Apco crank case arm for Ford cars.    The decree of the District Court also sustained the defendant's counterclaim, and ordered the relief sought therein by directing an injunction to restrain plaintiffs' alleged inequitable conduct in threatening suits and intimidating customers of the defendant.    The decree also referred the case to a master, to take an account of damages sustained by the defendant by reason of the plaintiffs' alleged wrongful acts.

The plaintiffs' 30 assignments of error are intended to raise the ultimate questions:    Whether or not the Gerosa patent in suit is valid and infringed by the defendant; whether or not the defendant was guilty of unfair competition in copying plaintiffs' commercial form of the patented device, in obtaining a design patent and marking its goods with the word "patented," and advertising that it owned a patent covering the devices sold by it; whether or not the plaintiffs were guilty of unfair competition or of inequitable conduct in advertising, in threatening suits against persons alleged by the defendant to be its customers; and whether or not defendant was entitled to an accounting for alleged damages sustained by it because of plaintiffs' alleged inequitable acts.

[1] The specification of the patent in suit points out the liability to breakage of the lugs or arms of automobiles of the Ford type, and that to remedy such breakage requires the dismantling of the power plant to get at the transmission cover, so that a new connection may be effected; that the Ford Company furnishes crank case arms of substantially the same construction as the original arms or lugs, to replace broken arms, but that this method of repair is expensive; that the principal objects of the invention are to overcome the above features and to—

"provide improved power plant supporting lugs which may be readily applied by unskilled labor in a few moments and, second, to provide inexpensive, simple, efficient lugs for application to a motorcar chassis before or after the ordinary lugs become broken, whereby, in case the improved lugs are applied prior to breakage, they will still maintain the motor transmission and its complemental propeller shaft in alignment, and whereby, in case the support is applied after breakage, dismantling of the engine is obviated."

All the claims are put in issue:

"1. In a motor vehicle construction, the combination of a chassis frame, a flanged power plant housing, lugs interposed between said frame and housing, and secured thereto for supporting the housing, auxiliary supporting lugs having forked ends interposed between the flange of said housing and said frame, the forked portion of such auxiliary lugs straddling the first-mentioned lugs, and means for clamping said auxiliary lugs to said flange and to the chassis frame.

"2. In a motor vehicle construction, the combination of a chassis frame, a flanged power plant housing, lugs interposed between said frame and housing, auxiliary supporting lugs, each embracing a vertical plate having a horizontally disposed forked extension and a top extension, which extensions are oppositely disposed, which auxiliary supporting lugs are interposed between the flange of said house and said frame, the said forked portions straddling a first-mentioned lug and the top extensions resting upon the chassis frame, bolts for securing said top extensions and said plate to the chassis frame, and bolts for securing said bottom extensions beneath said housing flange.

"3. A power plant housing supporting lug, comprising a vertical plate having a relatively wide base, said plate converging to a contracted top, said plate having a horizontal top extension and a horizontal forked bottom extension.

"4. A power plant housing supporting lug, comprising an integral member consisting of a vertical tapered plate having a top and bottom extension of which the lower extension is forked, said extensions being oppositely disposed.

"5. In a motor vehicle construction, a chassis frame, a two-part power plant housing having flanged portions bolted together, a hanger for the housing bolted to the top and side of the frame in combination with an auxiliary lug for supporting the housing in event of breakage of said hanger, comprising an apertured plate having top and bottom extensions, of which the top extension is apertured and is adapted for engagement over the frame top, and of which the lower extension is apertured and is shaped and proportioned to engage over at least a portion of said hanger in abutting relation with the underside of said flanged portions, the various apertured portions of said auxiliary lugs aligning with said bolts in flanges and frame, whereby the aforesaid bolts may be re-employed for securing said lug to the flanges of the housing and to said frame.

"6. In a motor vehicle construction, the combination of a chassis frame, a power plant housing having flanged portions bolted together, and a hanger for the housing bolted to the chassis frame, with an auxiliary lug for supporting said housing in the event of breakage of said hanger comprising an apertured body portion having upper and lower extensions, of which the upper extension is adapted for engagement over the chassis frame top and of which the lower extension is apertured, and is shaped and proportioned to engage over at least a part of said hanger in abutting relation with the flanged portion of said housing, the apertures of said auxiliary lug aligning with the aforesaid bolts in the frame and housing flanges, whereby said bolts may be re-employed for securing said auxiliary lug to the chassis frame and to the housing.

"7. A power plant housing supporting lug, comprising a vertical body portion having an upper and lower horizontal extension, the lower extension being forked to accommodate the housing parts.

"8. A power plant housing supporting lug, comprising a vertical body portion having an upper and lower horizontal extension, the lower extension beng forked and provided with bolt openings, and at least the said body portion being provided with an additional bolt opening."

The eight claims of the patent may be divided into two classes: Claims 1, 2, 5, and 6 state the alleged invention in detail; they present a combination. Claims 3, 4, 7, and 8 may be called the broad claims. Claim 1 presents the substantial features of the combination claims; all of these features are to be found in the parts of a motor vehicle construction. They are: (1) A chassis frame; (2) a flanged power

plant housing; (3) lugs interposed between the frame and the housing; (4) means for securing the lugs to the frame and the housing for sup-: porting the latter; (5) auxiliary supporting lugs interposed between the housing flange and frame, the forked portion of such auxiliary lugs straddling the first-mentioned lugs.

The patentee says the first four of the above elements are old, and are arranged in the usual way; that his invention resides in the fifth element, namely, the auxiliary supporting lugs, and in the combina-. tion of this element with the other four; that this presents a new and useful method of repair of the Ford arm; that the device is especially adapted to the repair of model T of such car; that claim 1 covers the structure wherein the repair arm is assembled before a breakage has occurred; and that claims 2, 5, and 6 are drawn to cover a supporting lug assembled after the original lug has been broken; that Gerosa, the patentee, attached his device to the frame in substantially the same way the Ford arm was attached, and in fact to the same openings; at the bottom, however, he attached his arm to the parting flanges of the upper and lower crank casings; that the original Ford arm—attached rigidly to the frame at the top—was attached to a flexible pan at the bottom, and permitted vibration sidewise of the frame, which caused a break; that it was found that the connection of the frame in a rigid manner at both top and bottom eliminated breakage; that the use of the lug in connection with the other four elements is new, especially in the repair of Ford cars.

Claims 3, 4, 7, and 8 are the broad claims; in claim 7 the essential features are briefly brought before us:

"A power plant housing supporting lug, comprising a vertical body portion having an upper and lower horizontal extension, the lower extension being forked to accommodate the housing parts."

These claims present a Z-shaped bracket with the lower middle portions of the Z cut away, to properly fit the structure to which it is applied. They cover an ordinary bracket, which has a vertical body portion and an upper and lower horizontal extension; such extension being cut away, to accommodate the parts against which it is to abut.

The patentee alleges that his invention results in a bracket constructed in a particular way for a particular purpose; that he had the problem before him of repairing a broken bracket on a Ford car, so that the repaired arm would not break as the original arm had broken; that he wished to repair it in such a way that the repaired part could be easily and quickly applied without disturbing the engine parts. He urges that the ordinary mechanic might produce an angle iron bracket of a Z-shape which would bear weight and would make a temporary repair, but he would not know why the arm broke, and would not know how to overcome the cause of the breakage; that he would not know the reasons for adopting the means to prevent breaking which the patentee has disclosed.

He urges, further, that automobile engineers of long standing testify that patentee's contributions over the prior art were such as were not within the possibilities of the ordinary mechanic and that the commercial results of the invention have been very great.

When we examine the specification and the claims, we find the patentee has said that the chassis frame, the flanged power plant housing, the lugs interposed between the frame and the housing, and the means for securing the lugs to the frame and to the housing, are all of well-known construction, and that the patentee uses the parts as he finds them, in applying the improved lugs. It appears to us that, in effect, he leaves each of these four elements to act in exactly the same way they have always functioned in automobile structures. He adds to them the supporting lugs of a Z-shape, with a piece of metal cut away in the lower extension of the Z, as auxiliary supporting lugs. It appears to us, however, that these lugs serve the same purpose as the main lugs. They act as a reinforcement to the main lugs. The patentee describes in his specification how the lugs are formed, and their application after the ordinary lugs supporting the power plant have been broken. It is largely upon the "lugs having forked ends" that the invention is predicated. It seems to us that these lugs correspond to the old elements which we have described in the elements from 1 to 4, and that there is merely a duplication of the first four elements by the lugs, which relate to the auxiliary arm, and which are intended to provide additional supporting means between the crank case and the car frame. The bolts for securing these auxiliary arms in position are the same which apply to the first four elements.

We think the result is that to an old structure is added a new structure which functions the same in relation to the old structure as it did by itself; that it is simply an aggregation of old elements, and does not present a patentable invention; and that it cannot be sustained as a combination patent.

With reference to the broader claims, 3, 4, 7, and 8, each of these claims appears to read perfectly on the old Ford arm, which had a vertical plate and a lateral extension at the top, and lateral extension at the bottom; and these had a forked effect, in that they had two separate resting places on the lower lateral extension. We think the blacksmith could take an ordinary piece of angle iron, make it into a Z-shaped supporting bar, and cut out the middle part of the lower lateral extension to enable it to fit around any obstruction, and that this is substantially all that these claims effect. The supporting arm of the Gerosa patent appears to be nothing more than an ordinary bracket or arm, which an automobile mechanic could make in effecting repairs whenever he was called to such service. We see no reason why the old Ford arm does not do what each of these claims assumes to do.

It is clear that the patentee made a practical adaptation of mechanical means to effect a repair in the Ford car. He showed mechanical facility in making his repair quickly and at little expense. We think, however, that his improvement did not amount to a discovery, and that it is not entitled to be classed as a use of the inventive faculty. We think he did nothing more than the skilled mechanic, familiar with automobile construction, would have done, having the same problem before him. It is not necessary for the carpenter or blacksmith to be able to go through the mental processes of the patentee in finding

out the reasons for what he did. The important thing is to find whether he was able to do the essential thing that the patentee did. He may not have had the manual training to do the repair work as well as the patentee could do it, nor the mental training to understand what he did and the reasons for doing it as well as the patentee understood them; but he knew enough to do the essential thing which the patentee did. In addition to the intrinsic evidence of the patent, Judge Brown in the District Court had many witnesses before him, who showed that the problem had in fact been presented many times to blacksmiths and other mechanics, both before and after the invention, and had been practically solved by them.

Credible oral testimony was offered that as early as 1910 certain mechanics had made repairs for broken crank arms by using a pair of Z-bars, which hung from the arm and engaged the flanges of the crank case. We think Judge Brown was right in saying:

"In considering the question whether or not it involved invention to construct a bracket which straddled the old crank case arm and engaged the flanges of the Ford automobile, we have to bear in mind that the problem was a limited one of repairing a specific broken machine, so that its crank case, whch had dropped, might be held up. It is in accordance with all the probabilities that any mechanic would have seen that the projecting flanges of the crank case afforded the most obvious point for support."

It is improbable that the patent would have been granted if the Patent Office had been advised of facts which were in testimony before the District Court.

In Hollister v. Benedict & B. Manufacturing Company, 113 U. S. 59, 71, 73, 5 Sup. Ct. 717, 724 (28 L. Ed. 901), the Supreme Court had before it a device which had not been anticipated by any previous invention in the prior patented art. The plain question before the court was the construction of the patent, without the aid of anything in the prior patented art. The court held that the precise idea had not been anticipated by any previous invention, but that it was not such an improvement as to make it an invention. In speaking for the court, Mr. Justice Matthews said:

"It is but the display of the expected skill of the calling, and involves only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice, and is in no sense the creative work of that inventive faculty which it is the purpose of the Constitution and the patent laws to encourage and reward."

The law is well understood that, in order to be an invention, an improvement must be the work of the inventive and creative faculty, and not merely the exercise of reason and experience, or the act of a mechanic skilled in the art. Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438; Thompson v. Boisselier, 114 U. S. 1, 12, 5 Sup. Ct. 1042, 29 L. Ed. 76. In Butler v Bainbridge (C. C.) 29 Fed. 142, Judge Coxe has pointed out the perplexities which surround questions of patentable invention, and that such questions cannot always be solved by examination of adjudged cases. Such cases, he says, "serve to illuminate the paths to be traversed, but he who desires to select the right one must depend largely upon his own

judgment." Without doubt it is the duty of a court to recognize the inventor when it meets him; but it is also its duty not to extend such recognition to mere mechanical skill It is as important to afford protection to manufacturers and mechanics in their right to employ old devices for new situations as it is to safeguard inventors in their discoveries. Dr. Eliot, a philosopher as well as educator, teaches that fundamental trades, such as those of the carpenter, the mason, and the blacksmith, have provided valuable education for the human race, and that it is the duty of modern science to encourage those who engage in fundamental mechanics to acquire more skill in manual training and in sense-training, in order to produce results far beyond those that are now produced. Clearly it is an injustice to discourage such mechanics by granting a monopoly to patentees for doing what skilled blacksmiths have been doing for years.

We think that to grant a monopoly upon the bracket claimed to be covered by the Gerosa patent would be to prohibit automobile mechanics from continuing to do what they have done for a long time. We think no discovery or novel idea has been developed by the Gerosa patent, and that the patent must be pronounced invalid for lack of patentable invention.

[2] A charge of infringement of trade-mark and of unfair competition is made in the bill of complaint. This charge is based upon copying plaintiffs' device and design, copying their advertising matter, copying the name and term "Crank Case Repair Arm," and palming off defendant's arms as those of the plaintiffs. This part of the controversy does not involve patent law. Gerosa, the patentee, testified that the shape of the arm results from the necessity of registering with the bolt holes already in the Ford arm. There is nothing distinctive in its shape. The A-shaped form had not been manufactured by the defendant for about two years before the filing of the bill, and equitable relief by way of injunction cannot be afforded for past injuries, but should be used only for the prevention of further injuries. Kennicott Water Softener Co. v. Bain, 185 Fed. 520, 521, 107 C. C. A. 626; Munger Laundry Co. v National Marking Machine Co., 252 Fed. 144, 164 C. C. A. 256.

The proofs show that defendant did not use the term "Crank Case Repair Arm," but that it did use the well-known descriptive term "Crank Case Arm."

It does not appear that the defendant ever obtained any advantage by its design patent, and it is clear that the plaintiffs have no right to complain, whether the defendant had a design patent, or whether it marked its design product as "patented."

[3] In Ward Baking Company v. Potter-Wrightington, Inc. (C. C. A.) 298 Fed. 398, this court has just considered the fundamental questions arising in a trade-mark case. A trade-mark is a right pertaining to an established business or trade in connection with which the mark is employed. The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another. Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 414, 36 Sup. Ct. 357, 60 L. Ed. 713; Coca-Cola Co. v. Glee-Nol Bottling Co., 221 Fed. 61, 137 C. C. A. 83; Howe Scale Co. v.

Wyckoff, Seamans & Benedict, 198 U. S. 118, 140, 25 Sup. Ct. 609, 49 L. Ed. 972.

It is enough to say, in the present case. that the defendant is not shown to have done anything indicating an intention to palm off its goods as those of the plaintiffs. The defendant marked its product with the name "Apco," and advertised it under that name, clearly showing that it was not the product of the plaintiffs. Keystone Type Foundry v. Portland Publishing Co., 186 Fed. 690, 108 C. C. A. 508. There is no proof of any act of deception on the part of the defendant. The charge of unfair competition on its part is not sustained. We agree with the District Court in finding that there is no merit in plaintiffs' contention in reference to infringement of their trade-mark rights by the defendant.

The counterclaim of the defendant is in effect a bill in equity, asking for injunctive relief and damages, by reason of interference on the part of the plaintiffs with its business.

[4, 5] The owner of a patent has an undoubted right to use all reasonable means to protect his patent, and his business under the patent, from the attacks of infringers; to this end he may, of course, advertise in good faith and within reasonable bounds. It appears from the proofs that the plaintiffs went beyond reasonable limits in their attacks upon the defendant. They obtained consent decrees, and proceeded to send circulars to the trade and to a great number of defendant's customers, with copies of such decrees, and with the evident purpose of representing that they had won their suits. They never stated that their decrees were consent decrees. The obvious effect of their circulars and of their advertising was to cause the trade to believe that the courts had decided their patent to be valid as against the "Apco." While courts have always held themselves open to protect patentees and their business, they cannot permit the use of the court's name, in advance of adjudication, to harass or obstruct a rival. A patentee who should do this is held to come into court with unclean hands. Luten v. Wilson (C. C. A.) 263 Fed. 983; Panay Horizontal Show Jar Co. v. Aridor Co. (C. C. A.) 292 Fed. 858.

In the present case, the attacks by the plaintiffs, characterizing the defendant as a "thief" and a "pirate," were clearly beyond the reasonable rights of the plaintiffs. They amounted to unlawful intimidation. The proofs show that the defendant suffered some substantial damages from these attacks. It was put to expense by the giving of bonds and attending to the defense of actions; many of its customers were assailed with circulars and advertisements, causing some detriment to its business. Such damages were clearly more than merely nominal, although they are not shown to have been large.

We find no error in the decree of the District Court that the defendant was entitled to relief under its counterclaim, and to injunction against unlawful intimidation; also that the defendant recover damages, and that the case be referred to a master. It does not, however, appear from the record that the defendant will seek to recover large damages, or that it will, in fact, seek to enforce its right to any damages in the premises. There appears to be no reason why we should not allow the decree to stand, referring the matter of damages to a

master. If, upon the coming in of the master's report, it is found that the defendant, is seeking to obtain more damages than it ought to have, the court can take such action as is required.

The District Court was right in its decree dismissing the plaintiffs' bill, in enjoining the plaintiffs from threatening or intimidating the defendant or its customers, and in its reference of the cause to a master to take an account of damages and assess same, pursuant to law and the Equity Rules.

The decree of the District Court is affirmed; the defendant appellee recovers costs in this court.