**SWANK, Inc. v. ANSON, Inc.**

**Civ. A. No. 1033.**

United States District Court
D. Rhode Island.

Aug. 24, 1951.

Herbert B. Barlow, Matthew W. Goring, both of Providence, R.I., and John V. Groner and William K. Kerr, both of New York City, for plaintiff.

Santi Paul, Alfred E. Motta, and Nathaniel Frucht, all of Providence, R.I., for defendant.

HARTIGAN, Circuit Judge.[*]

This is a civil action for unfair competition brought by Swank, Inc., a Delaware corporation having its principal office in Attleboro, Massachusetts, against Anson, Incorporated, a Rhode Island corporation having its principal office at Providence, Rhode Island.

The complaint in substance alleges that the plaintiff and its predecessors have been engaged in the business of manufacturing and selling men's jewelry, including tie holders, cuff links and key chains since 1908; that during said period the plaintiff has spent large sums in advertising and promoting its merchandise and in familiarizing the public with its products and causing them to associate said products with the plaintiff.

The complaint further alleges that commencing in or about the fall of 1947, defendant commenced manufacturing and distributing for sale copies of numerous products designed, manufactured, sold, and popularized by the plaintiff under and associated with its name Swank; that in many cases such products are such exact copies of plaintiff's products as to make distinction by the purchasing public substantially impossible; that defendant's deliberate intent and obvious purpose in thus

[*] Designated to hold District Court in District of Rhode Island.

counterfeiting the merchandise of plaintiff were to deprive plaintiff of its lawful reward for its labor, investment and ingenuity, to deceive the purchasing public, to trade upon the reputation and good will which had become attached to plaintiff and its products and to profit by the inevitable resulting confusion; that as a result of such acts, the defendant has made it possible for the retailer to palm off defendant's products as the products of the plaintiff and has misled and deceived many of the public into buying the products manufactured and sold by the defendant in the belief that such products are manufactured and sold by the plaintiff with resultant diminution in the business and profits of the plaintiff.

The plaintiff prays that the defendant be enjoined and restrained from competing unfairly with plaintiff; that the defendant be required to deliver up for destruction its inventories of unsold products which defendant has illegally copied and that defendant give an accounting to the plaintiff for all profits realized by it from such alleged unfair competition.

The defendant filed an answer denying the allegations of unfair competition.

The plaintiff and its predecessors have manufactured and sold men's jewelry, including collar holders, tie clips, cuff links, key chains and belt buckles since 1908 and adopted the name "Swank" in 1927 and since 1931 that name has been prominently associated with all men's jewelry manufactured and sold by it.

During the period 1927 to 1949 the plaintiff's sales of its products bearing the name "Swank" amounted to approximately $61,000,000.

The plaintiff has extensively advertised men's jewelry products spending therefor a total of $4,294,094 during the period of 1928 to 1948 and of this amount about $1,500,000 during the years 1947 and 1948.

The plaintiff from November, 1946, to June, 1949, spent for national advertising alone, on the products here in issue, as follows: Pin Klips $106,324.17; Loop Links $26,167.97; Turban Links $16,361.32 and Extension Key Chains $16,324.78.

The plaintiff has over 100 salesmen engaged in the sale of its products and since 1945 has not sold through wholesalers or distributors but solely through its own salesmen, to the haberdasher, the retail jeweler and a few drug stores.

The defendant has been in the business of manufacturing and selling men's jewelry since the fall of 1945 when it commenced to advertise some of its products. Some of this advertising was in magazines of national circulation but most of it was in trade magazines. The defendant sells exclusively through wholesalers or distributors.

In the period from 1945 to 1946 some employees of Swank in sales and distribution terminated their services with the plaintiff and set up wholesale firms which were in some degree competitive with Swank. These firms are Ken Products, Inc., Boston, Massachusetts, covering New England generally; Oxford Jewelers, Inc., New York City, covering the central Atlantic states generally and A. C. Lavick, Inc., Chicago, Illinois, covering the middle west. They became important distributors of the defendant. The plaintiff does not assert that these concerns made any improper use of the plaintiff's customer lists.

On January 2, 1946, plaintiff introduced to the trade its first of a number of tie clips having an ornament from which a portion had been removed to give the appearance that the ornament actually pierced the necktie of the wearer. The plaintiff makes no assertion of the right to monopolize piercing illusion tie clips as such. Between that date and the date of the institution of this action the plaintiff introduced tie clips having the following ornaments, which are here in issue: Safety Pin, Arrow, Sabre and Scimitar. Decorative features, such as the sabre handle, from time to time, were changed, though the basic pattern of each remained substantially the same.

The first of plaintiff's clips were known as Klip Pins but by May 17, 1947, the name had been changed to Pin Klips and the plaintiff sold between two and three million of them.

On January 2, 1946, the plaintiff introduced a piercing illusion safety pin tie clip and produced 29,000 of them in 1946. The plaintiff advertised them in the New York Times on November 19, 1946 and in Life Magazine on November 11, 1946. It received its first order January 8, 1947, against which a shipment was made January 14, 1947.

On March 24, 1947, the defendant received an order from Lavick for a safety pin tie slide which it filled on April 26, 1947.

The plaintiff's and defendant's safety pin tie clips differ. The defendant's design is the conventional safety pin type while that of the plaintiff is the coiled wire type.

During the fall of 1946 the plaintiff determined to apply the piercing illusion idea to other ornaments to be used on its Pin Klips. One of these was an arrow. It was designed on November 25, 1946, and the first order received in April, 1947. It was first nationally advertised on May 17, 1947 in the Saturday Evening Post; in Life on May 26, 1947 and later in Esquire October, 1947; in Collier's October 11, 1947; in Saturday Evening Post October 18, 1947 and in Life November 3, 1947.

Frederick W. Barr, an advertising illustrator, was employed by the defendant in 1945 to prepare designs for a tie holder. In April, 1945 he designed and created a representation of a split arrow, having a piercing illusion, and the mechanical features thereof.

On November 28, 1947, Ken placed an order with defendant for "New Arrow (It Opens) Tie Slide". On December 10, 1947, Lavick placed its order for "Arrow Grip Clip" and a Globe order was placed on December 4, 1947, for "New Arrow Tie Slide". The Ken, Lavick and Globe orders were filled in December, 1947 and the defendant's first advertisement of this clip appeared in the May 1948 issue of Jewelers' Circular Keystone.

In May, 1948 the defendant brought out a new arrow design which was somewhat like that of the plaintiff and advertised it for the first time in Apparel Arts for August, 1948 together with a number of defendant's grip clips, each of which was identified with the Anson catalogue number.

Plaintiff designed and introduced sabre Pin Klips contemporaneously with its arrow Pin Klip. On October 25, 1946 plaintiff designed its sabre Pin Klip, having a gold colored blade and a ribbed silver-colored handle, which went into production in November, 1946. Plaintiff's first order on this was taken on April 15, 1947, against which a shipment was made on June 6, 1947. This clip was nationally advertised in the May 17, 1947 issue of the Saturday Evening Post and in Life on May 26, 1947.

On March 10, 1947, defendant designed a drawing and model of a sabre tie clasp. On March 11, 1947, defendant wrote to Lavick, Ken and Oxford, enclosing with these letters a photograph of a hand-made sample of the "Anson Saber" tie slide. This design was unlike the design of any pin clip manufactured and sold by the plaintiff and no charge of simulation has been made against it. Subsequently, defendant produced its sabre clip here in issue.

Defendant's sabre tie clip differs from that of the plaintiff in minute and generally unnoticeable details and in certain functional features but it has a gold-colored blade and a ribbed silver-colored handle.

The defendant's president testified that its sabre had been designed from the March sword and said it was produced as a result of original research by defendant in libraries, etc. and submitted a folder containing drawings, photographs, etc. of about 150 weapons.

In August, 1947 the plaintiff designed a sabre like that designed on October 25, 1946 but substituted a white imitation pearl handle for the silver handle of that sabre. The first order on this clip was January 8, 1948, which was filled on March 8, 1948. It was first advertised nationally in the August 28, 1948 issue of Collier's.

The defendant made a similar white handle sabre clip. The first evidence thereof is in its internal memo of an order from Ken dated December 10, 1948 for such a sabre. The defendant advertised this item in the August 26, 1949 issue of Men's Wear.

Both plaintiff's and defendant's white handled sabres strongly resemble each other.

In August, 1947 plaintiff designed a scimitar Pin Klip. Like the sabre, this had a gold-colored blade and a ribbed silver-colored handle. The first order on this clip was taken January 8, 1948 and the first delivery made on March 8, 1948. This clip was first advertised in the March 15, 1948 issue of Life. The defendant likewise produced a silver-handled scimitar, and produced a bill dated April 29, 1948 for the hub cutting of such a scimitar and a drawing of a part of a scimitar, dated January 27, 1949. The defendant first advertised this scimitar in the August, 1948 issue of Apparel Arts. Plaintiff's and defendant's scimitars are substantially alike. However, the defendant's scimitar somewhat resembles a scimitar made by Silverman Brothers which was given to the defendant's vice president in 1946 and which defendant claims influenced its design.

In September, 1947 the plaintiff designed and made a model of a scimitar like that designed in August 1947 except that it had a simulated white pearl handle instead of a silver handle. The first order on this was January 8, 1948 and the first delivery March 8, 1948. It was first nationally advertised in the August 28, 1948 issue of Collier's and pictured in the November 6, 1948 issue. On December 10, 1948 Ken placed an order with defendant for a scimitar. Defendant first advertised its scimitar clip in the August 26, 1949 issue of Men's Wear. The plaintiff's and defendant's scimitars have gold blades, hand guards and white handles and also strongly resemble each other.

In February, 1948 plaintiff added to its line a scimitar clip like those previously described but with a red (and other colored) imitation pearl handle. Its first order for this clip was dated July 7, 1948 and delivery was made on September 22, 1948. It was first advertised in Collier's on August 28, 1948 and pictured in the November 6, 1948 issue of Collier's.

On December 10, 1948 Ken ordered such a clip from the defendant and it is not clear if this order was filled but the defendant first advertised its clip in the Au-gust 26, 1949 issue of Men's Wear. The plaintiff and the defendant's red handle scimitar clips are substantially alike.

In February, 1948 plaintiff designed a scimitar clip like those above except that it was made of sterling silver with five marcasites set in the handle. Samples of this article, with a display on which the article was mounted, were sent to plaintiff's salesmen in April, 1948. The plaintiff's first order was taken April 7, 1948 on which delivery was made June 1, 1948. This item was not nationally advertised by the plaintiff.

The defendant produced an order, dated August 3, 1948, for a generally similar scimitar clip having four stones instead of five in the handle. Its handle was silver-colored and its blade gold-colored. The stones used in the handle were red, white or other colors. The defendant made delivery on said order on August 13, 1948. This item was first advertised by defendant in the September, 1948 issue of Jewelers' Circular Keystone and in other trade magazines. The plaintiff's and defendant's scimitar clips with the stones set in the handle are substantially alike.

In March, 1949, plaintiff designed a scimitar substantially like those described above but having a leather handle which was introduced in the trade in July or August, 1949. About the same time the plaintiff designed a sabre like those designed October 25, 1946 and in August, 1947, also having a leather handle.

In August, 1949 defendant sent some of its sword and scimitar Grip Clips to Boston to have leather placed on the handles. These were returned to the defendant on September 2, 1949. The record does not show that the defendant has taken any orders or made any sales for these products or that they have gone into production.

During 1948 plaintiff devised cuff links in which the ornamental part was flattened and shaped like a letter "J"—designed so that the short leg of the "J" would encircle the side edges of the cuff. These links were made in a number of patterns, to all of which plaintiff gave the name "Loop Links". Among the patterns were the flat-

tened chain design and the diagonal rib design.

On April 9, 1948 a Loop Link was designed by the plaintiff having as its ornamental part a relatively heavy flattened chain. Plaintiff's first order for this cuff link was dated July 9, 1948 which was filled September 17, 1948. It was first advertised in the October 16, 1948 issue of the Saturday Evening Post.

On October 29, 1948 Oxford ordered from defendant samples of essentially the same link. Defendant's internal memo covering this order contains this statement in longhand: "Rush ½ dz. Hand Samples as soon as possible," and samples were shipped November 30, 1948. The defendant's links were first advertised in the Pacific Goldsmith for December, 1948. The defendant's links differed mechanically from the plaintiff's links in that the post, designed to be inserted through the button hole, is hinged and swings open. The short leg of its "J" encircling the edges of the cuff, is slightly longer than in the corresponding link of plaintiff.

Simultaneously with the design of plaintiff's flat chain Loop Links, it designed diagonal rib Loop Links. The first order for this was dated July 9, 1948 and filled September 17, 1948. The defendant made a similar diagonal ribbed link having the same mechanical construction as its chain design link and produced an order dated December 24, 1948. The defendant's first advertisement of this link appears in Men's Reporter, a trade magazine, on March 21, 1949. The plaintiff's and defendant's links are very much alike.

On June 19, 1945, plaintiff designed a cuff link having as its ornamental feature a relatively large representation of a knot made of silver-colored double wire stock and gold-colored bar stock. The bar stock, rectangular in cross-section, and double wire stock, of about the same cross-section, were so interwined as to look like a Turk's Head knot. Plaintiff called these "Turban Links." Plaintiff's first order is dated September 24, 1946, which was partly filled on November 25, 1946 and completed on December 20, 1946. This link was advertised in the Chicago Tribune on December 22, 1947 and in the Saturday Evening Post on September 11, 1948. The plaintiff admits that "the use of some form or type of Turk's Head Knot as an ornament on a piece of jewelry is old."

The defendant made similar links. The defendant's first order was taken December 27, 1948 and filled on March 12, 1949. The first advertisement by the defendant appeared in the August 26, 1949 issue of Men's Wear.

In October, 1948 plaintiff designed certain leather cuff links and matching tie clips having a gold rim and seemingly held in place by hob nails. These went out for sale in January, 1949 to reach the public in March or April, 1949.

On July 1, 1949 defendant delivered to Ken samples of certain hob nailed leather jewelry generally like that of plaintiff.

In 1938 an application for Letters Patent covering the construction of an extensible key chain was assigned to plaintiff by Nathaniel N. Okun. On March 10, 1939 plaintiff made its first royalty payment, which was based on plaintiff's shipments of extensible key chains. Plaintiff's first advertisement of this chain appeared in its 1940–1941 catalogue.

The defendant has manufactured and sold an extension key chain. It has produced drawings of its key chain dated November 29, December 3 and 11, 1946. Its first order, from Oxford, is dated December 31, 1946. The defendant first advertised its chain through a customer in the Times-Picayune New Orleans States Magazine for January 26, 1947.

In early 1947 defendant approached plaintiff to secure a license under the Okun patent, but this was refused. Defendant's chain avoided plaintiff's patent but looked substantially like it.

In April, 1948 plaintiff designed a set which it called "The Bold Set"—comprising matching cuff links, tie clip, and key chain, in the flat chain design, much like plaintiff's chain design Loop Links. This was distributed to plaintiff's salesmen in September, 1948. Plaintiff's first order was dated October 12, 1948 and delivery was made before November 1, 1948.

Defendant produced a somewhat similar set and its first order was received on July 28, 1949 and filled August 2, 1949.

About 1931 or 1932 plaintiff evolved what it called "a family of Swank packages." One feature of this family of boxes was the maroon pad, upon which the article of jewelry was mounted. This was adopted in 1937 for boxes that went to the haberdasher, and remained unchanged until July, 1949 when it adopted a gray pad in its red boxes.

The plaintiff's executive vice-president testified that "the maroon pad is as old as the hills" and that many people used it before Swank. He also testified that Swank on some occasions had allowed retailers—such as Marshal Field, Broadstreet's and John David—to stamp their names on Swank boxes.

In 1941 Swank adopted a particular type of box for its family of boxes. The top of this box was of gold and a heavy maroon panel, which covered almost all of the top face and the front and rear sides and bore in gold the name "Swank". The gold covered the two side faces of the top and formed a border on either side of the top face. The bottom of the box was of yellow or buff-colored card-board and the pad was maroon.

Shortly after World War II plaintiff adopted a new group of boxes. This group included some gray boxes with pads colored other than maroon, for use in the jewelry trade. Since February, 1946 plaintiff has used a box, illustrated by plaintiff's Ex. 22–A, that has a maroon top, gold bottom and maroon pad. Substantially all of plaintiff's products have been packaged in this box.

The plaintiff's products were displayed by the retailer within boxes like plaintiff's Ex. 22–A, the top being removed and placed beneath the bottom. The customer saw the article mounted upon a maroon pad with a gold frame. Since the end of the war certain jewelry manufacturers, including the defendant, and its customers Ken, Oxford and Adam Hat, have adopted a maroon pad like that used by plaintiff,

and this practice caused plaintiff, in July, 1949, to adopt a gray pad in its red box.

Plaintiff furnished to its retail customers various displays and display trays, all of which bore plaintiff's name "Swank". In these display trays, plaintiff's products, mounted on their pads within their individual boxes, were shown by the retailer, either in his store window or in or on his showcase. Trays were of a size which allowed twelve of plaintiff's boxes to fit therein.

It appears that the use of display trays is not in itself new and has been prevalent in the trade for a good many years. Others before plaintiff had used maroon or gold in their boxes and maroon pads.

Defendant since the beginning of 1948 has used a box having a cream or buff top with the Anson name plainly marked thereon and it has a gold base and a maroon pad. While the maroon pad in each has a gold edged frame, when telescoped the outer frame of Swank is maroon and that of Anson is cream or buff colored.

Defendant's products were displayed by the retail merchant in much the same way as the products of the plaintiff, that is, the top was removed and placed beneath the bottom of the box in telescope fashion, so that the maroon pad with the article attached thereto was prominently displayed. This box fitted within the defendant's display trays as well as those of plaintiff. Although the plaintiff's and defendant's boxes looked somewhat alike when open for display, yet each party prominently displayed its name thus minimizing the possibility of confusion. The display trays of Swank and Anson are clearly distinguishable.

By May 17, 1947 plaintiff had adopted a nationally advertised "Pin Klip" as the name for all of its tie clips which gave the appearance that the ornament pierced the necktie of the wearer. In December 1947 defendant adopted as the name for its piercing illusion clips, the words "Grip Clip."

By June 22, 1948 plaintiff had adopted "Loop Links" as the name for its cuff links

which encircled the edges of the cuff and in December, 1948 defendant adopted the name "Kuff Loops" for its articles.

When plaintiff marketed its Turks Head knot links in 1946 it adopted as their name, "Turban Links". In 1949 when the defendant introduced its similar links it advertised them as "Turban Two-Tone".

In packaging its Pin Clips plaintiff employed a paper filler which was inserted immediately beneath the ornamental part of the clip to hide the mechanical or functional parts. This filler was about 2½" long and about ¾" wide and was of a maroon color, and bore the words "Pin Klip by Swank." When the defendant commenced marketing its Grip Clips, it adopted a filler for the same purpose made of white paper with thin red lines and it carried the words "Grip-Clip—It Opens— By Anson" in the center, and differed in appearance from the plaintiff's filler. Later this filler was discarded by the defendant in favor of one of substantially the size and color and shape of that earlier used by the plaintiff and this filler contained, within a white circle in the center, the words "Anson Grip Clip" and at the right-hand bottom, the words "It Opens".

It was customary for the manufacturers of men's jewelry to insert small price tags at the front or lower side of the pad within the box. The tag of the plaintiff, with respect to all of the articles here involved, was made of maroon paper with a gold border. The name "Swank" and, in some cases, the words "Pin Klip" and the price were printed on the tag in gold figures or letters.

The defendant adopted a price tag which was placed in the same relative position on its pad which was maroon with a gold border, gold lettering and substantially the same size and shape as that of the plaintiff and carried the name "Anson" and the price in gold.

Plaintiff early adopted and constantly has used as the dominant feature of its advertising and its displays of Pin Klips, a representation of or an actual necktie, upon which is mounted one of its clips. The defendant, since the introduction of its Grip Clip, has featured it on a necktie in a similar manner as that employed by the plaintiff.

The facts in this case lead me to the belief that the defendant manufactured and distributed for sale copies which were quite close to numerous products designed, manufactured, sold and advertised by the plaintiff. I also believe that the defendant's designs were suggested, except perhaps the Barr design and idea, by the plaintiff's designs which were not patented.

Men's jewelry is a highly competitive business and the credible testimony convinces me that it is difficult, if not impossible, for one manufacturer to identify himself with any particular item. The evidence does not convince me that the products of the plaintiff have acquired a secondary meaning. Even though it be admitted, as the plaintiff contends, that secondary meaning need not be shown in order for the plaintiff to prevail, yet the plaintiff must establish palming off by a preponderance of the evidence.

The plaintiff states that it "claims no monopoly rights in the generic form of piercing illusion tie clips, or cuff encircling links or any of the other articles here involved. It does claim the right to exclude defendant from copying its particular designs of these articles and dressing them so they are passed off as the products of the plaintiff."

It is clear that the defendant intended to give the plaintiff competition, but I do not find that the defendant intended to cause its products to be passed off as the products of the plaintiff. There is no doubt but that the defendant intended and sought to build up the Anson name just as much as the plaintiff desired to build up the Swank name in men's jewelry.

In Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U.S. 118, 140, 25 S.Ct. 609, 614, 49 L.Ed. 972, the court said:

"* * * The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another;

and if defendant so conducts its business as not to palm off its goods as those of complainant, the action fails."

See Goodyear Rubber Co. v. Goodyear's Rubber Mfg. Co., 128 U.S. 598, 9 S.Ct. 166, 32 L.Ed. 535 and Gerosa v. Apco Mfg. Co., 1 Cir., 299 F. 19.

█ The facts in this case do not warrant a finding of confusion or of palming off. The copying was of products in which the plaintiff claims and has no monopoly rights. I find that such copying, in the circumstances here, is not unfair competition. See Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161; Kellogg Co. v. Nat. Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, rehearing denied 305 U.S. 674, 59 S.Ct. 246, 83 L.Ed. 437; John H. Rice & Co. v. Redlich Mfg. Co., 3 Cir., 202 F. 155; Cheney Bros. v. Doris Silk Corporation, 2 Cir., 35 F.2d 279, certiorari denied 281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145; Zangerle & Peterson Co. v. Venice Furn. Novelty Mfg. Co., 7 Cir., 133 F.2d 266.

The defendant has prominently marked its products so that the ordinary purchaser would not be deceived under ordinary conditions. It has clearly informed the public of the source of its products by the use of its trade-name "Anson". No trademark or patent is involved and the defendant is not responsible on the facts here for isolated instances where a dishonest dealer's conduct might amount to palming off. See Coats v. Merrick Thread Co., 149 U.S. 562, 13 S.Ct. 966, 37 L.Ed. 847; Rathbone, Sard & Co. v. Champion Steel Range Co., 6 Cir., 189 F. 26, 37 L.R.A., N.S., 258.

The defendant sells its products as its own and has clearly identified them as such; whereas there is evidence that the plaintiff has allowed some retailers to sell certain of the plaintiff's products here in issue as their own. See Everett O. Fisk & Co. v. Fisk Teachers' Agency, 8 Cir., 3 F.2d 7.

Judgment, therefore, may be entered for the defendant, together with costs.